UNION PACKING COMPANY OF OMAHA, INC.,
AND FIREMAN'S FUND INSURANCE COMPANY,
APPELLEES, V. HENRY F. KLAUSCHIE, APPELLEE,
ARGONAUT INSURANCE COMPANY, APPELLANT.

314 N.W.2d 25

Filed Janaury 4, 1982.   No. 44060.

Joe P. Cashen and Jon S. Reid of Kennedy, Holland,

DeLacy & Svoboda for appellant.

Patrick B. Donahue of Cassem, Tierney, Adams, Gotch & Douglas for appellee Klauschie.

Ronald E. Frank of Sodoro, Daly & Sodoro for appellees Union Packing and Fireman's Fund.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

HASTINGS, J.

Union Packing Company of Omaha, Inc., and Fireman's Fund Insurance Company filed their petition in the Nebraska Workmen's Compensation Court seeking a determination as to whether Fireman's Fund or the Argonaut Insurance Company was liable for benefits under the Workmen's Compensation Act arising from an injury and subsequent disability suffered by an employee of Union Packing, Henry F. Klauschie. Argonaut contended that any injury sustained by the employee was not a compensable injury, and in any event the injury occurred prior to the effective dates of Argonaut's coverage, and therefore Argonaut was not liable. The court resolved both issues against Argonaut, and it has appealed to this court. We reverse.

Argonaut became the workmen's compensation insurer for Union Packing at 12:01 a.m. on April 15, 1979, following the expiration of the coverage provided by Fireman's Fund.

Henry Klauschie had been employed by Union Packing for about 11 years, approximately 10 of which years were spent trimming meat on the kill floor of the plant. Health and safety considerations required that he wear rubber boots while working, and he customarily wore two pairs of socks under the boots for comfort. Because of the nature of his duties, he would spend most of the day working on his toes and the balls of his feet.

Somewhere around the middle of March 1979, Mr. Klauschie noticed a break or blister on the ball of

his right foot. In his own words, it was "a little crack or a little . . . break. . . . It is white and had a little bump on it." He did not see a doctor immediately, but instead soaked the foot in Epsom salts every evening in an attempt to cause the sore to heal. There was no swelling associated with the sore in the early stages, and Mr. Klauschie testified that there was never really any pain.

Approximately 2 to 3 weeks prior to July 16, 1979, the foot began to swell and the sore commenced to darken. Four or five days before July 16, 1979, Mr. Klauschie's son urged him to see a physician, and on July 16th he first consulted with Dr. Charles F. Brannen. Dr. Brannen found a very severely infected foot, ulcerated at the bottom and extending up to the base of the toe, with marked swelling and cellulitis of the foot extending up to the mid-foreleg. He immediately arranged for the admission of Mr. Klauschie to the hospital. Further examination disclosed that the foot was infected with Staphylococcus epidermitis and Proteus mirabilis, which eventually developed into osteomyelitis, an infection of the bone. The failure of less radical means of treatment required the amputation of the great toe, second toe, first metatarsal, and one-half of the second metatarsal, and the cartilage of the cuneiform from the right foot.

According to the testimony of Dr. Brannen, the history given to him by Mr. Klauschie revealed that the blister had been discovered some 3 weeks prior to July 16th. In the doctor's opinion, the infection developed at the site of the blister and, due to its virulent nature, could not have begun as early as June 16th. It was his opinion that the infection began "within a week from the time . . . that the family began to worry about it," and at the earliest, after July 1, 1979.

Dr. Brannen testified further that, although he believed that the infection entered the system at the site of the blister, it was the continuous wearing of the rubber boots that created the proper

media for the bacteria to congregate and invade the tissue. Therefore, he stated that in his opinion, with reasonable medical certainty, the infection was caused by the wearing of the boots.

Dr. Richard M. Gross is the orthopedic surgeon who performed the necessary surgery on Mr. Klauschie in August of 1979. As a part of his opinion as to causation, he referred to Mr. Klauschie's diabetic condition, which in turn caused a loss of sensation in his foot. Therefore, he opined, he was allowed to develop a pressure sore from the wearing of rubber boots which in turn resulted in a necrotic vascular ulcer. The infection then followed. In the doctor's own words: "The osteomyelitis is an expression of an infection which sets down once the necrotic vascular ulcer is formed and this is a vascular injury as the primary injury in this man. The infection is a subsequent problem. But it is all in my opinion related back to the pressure injury of wearing the boots in the packing house." He went on to explain that the blister was just an expression of the vascular injury and the ulcer a step beyond the blister.

Dr. Calvin Davis, a physician and associate professor of internal medicine at the University of Nebraska, who is a specialist in infectious diseases, testified on behalf of Argonaut. He had not examined either Mr. Klauschie or his records, and testified only on the basis of hypothetical questions. He stated that both staph epidermitis and Proteus mirabilis are common in the environment and are no more likely to be found in a packing plant than in a home or hospital. However, staph epidermitis is part of the normal skin flora of human beings, and Proteus mirabilis is a part of the normal intestinal bacterial flora. He also offered that, with a couple of exceptions, it was almost unheard of for either bacteria to invade the skin in the absence of a preexisting wound or infection in that area. Interestingly enough, he said that the second most common clinical situation involving Proteus

mirabilis involves people who have ulcers on their feet as a result of diabetes and who have had a previous infection where it comes in as a secondary invader. Dr. Davis concluded by giving as his opinion that neither of these organisms are peculiar to the beef slaughtering industry, and are commonly found in infections in the general public, unrelated to packinghouse environment.

The Workmen's Compensation Court, on rehearing, with one judge dissenting, found that the pressure sore which degenerated into a blister formation and necrotic tissue was caused by the rubber boots which Mr. Klauschie was required to wear in his employment; that a bacterial invasion through that sore by staph epidermitis and Proteus mirabilis occurred on or about July 1, 1979, or in any event, not earlier than April 15, 1979; that the wearing of boots created ideal conditions for the invasion and growth of the infection, without which it would not have occurred; that the osteomyelitis and ultimate amputation resulted from that aggravated infection; and that Mr. Klauschie suffered an injury as a result of an accident arising out of and in the course of his employment, for which he is entitled to benefits as provided under the Nebraska workmen's compensation law. The final conclusion of the compensation court was that the accident causing the compensable injury and disability was the bacterial invasion of Mr. Klauschie's system which occurred after April 15, 1979, during the period when Argonaut was the insurer.

With the exception of the last conclusion drawn by the Workmen's Compensation Court, we have no problem affirming all the foregoing findings of fact. They are supported by sufficient evidence in the record and have the same force and effect as a jury verdict in a civil case, and, not being clearly wrong, will not be disturbed on appeal. *Mack v. Dale Electronics, Inc.*, 209 Neb. 367, 307 N.W.2d 814 (1981). The critical issue for us to decide is whether or

not the bacterial invasion of Mr. Klauschie's system was an accident arising out of and in the course of his employment by Union Packing, as determined by the Workmen's Compensation Court.

Two general rules expressed by the quotations to follow must be kept in mind. "The term 'arising out of' describes the accident and its origin, cause, and character, i.e., whether it resulted from the risks arising within the scope or sphere of the employee's job. The term 'in the course of' refers to the time, place, and circumstances surrounding the accident. The two phrases are conjunctive and the claimant must establish by a preponderance of the evidence that both conditions exist." *Stoll v. School Dist. (No.1) of Lincoln*, 207 Neb. 670, 672, 301 N.W.2d 68, 71 (1981). " 'The primary purpose of the workmen's compensation act is to insure an employee against accidental injury arising out of and in the course of his employment. To accomplish this purpose the act should be liberally construed, not to find that liability exists without the required quantum of proof, but to include within the protection of the act by liberal interpretation all injuries arising out of and in the course of the employment which the act does not clearly exclude. A strict interpretation should not be resorted to in order to accomplish such exclusion.' " *White v. Western Commodities, Inc.*, 207 Neb. 75, 86, 295 N.W.2d 704, 711 (1980).

Dr. Brannen testified that the sole cause of Mr. Klauschie's injury and disability was the result of his employment, i.e., the wearing of the boots. The physician performing the surgery, Dr. Gross, stated that in his opinion all of Mr. Klauschie's troubles related back to the pressure injury caused by wearing the boots. Finally, Dr. Davis, although expressing no opinion as to the cause of the sore on Mr. Klauschie's foot, did say that it was almost unheard of for either bacteria to invade the skin in the absence of a preexisting wound or

infection in that area. Although the medical testimony differs as to whether the skin break, the vascular injury, or the bacterial invasion was the causative factor in the resultant amputation and disability, at least Dr. Brannen and Dr. Gross agree that the injury arose in the course of Mr. Klauschie's employment. Even Dr. Davis agreed that a wound or infection was necessary to allow the invasion of the disability-causing bacteria, and he had nothing upon which to base an opinion as to the cause of that wound or infection. And even though Dr. Davis' testimony could be said to be in conflict with the other two witnesses, we have said that where a record presents nothing more than conflicting medical testimony, we will not substitute our judgment for that of the Workmen's Compensation Court. *Riha v. St. Mary's Church & School, Inc.*, 209 Neb. 539, 308 N.W.2d 734 (1981).

The next question to consider is whether or not there was an accident arising out of the employment. Neb. Rev. Stat. § 48-101 (Reissue 1978). An accident is defined as "an unexpected or unforeseen injury happening suddenly and violently . . . and producing at the time objective symptoms of an injury." Neb. Rev. Stat. § 48-151(2) (Reissue 1978). "The terms injury and personal injuries shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom." § 48-151(4). In dealing with these definitions, we have said that "the accident requirement of the act was satisfied if the cause of the injury was of accidental character or the effect was unexpected or unforeseen, and happened suddenly and violently. We also said that it was no longer necessary that the injury be caused by a single traumatic event, but the exertion in the employment must contribute in some material and substantial degree to cause the injury." *Crosby v. American Stores*, 207 Neb. 251, 254, 298 N.W.2d 157, 159 (1980).

In our opinion, the blister or vascular injury which

manifested itself in the early stages prior to April 15, 1979, as disclosed by the testimony cited above, constituted an accidental injury arising out of Mr. Klauschie's employment.

In reaching this conclusion, we are not ignoring the opinion of Cardozo, J., in *Matter of Connelly v. Hunt Furniture Co.*, 240 N.Y. 83, 147 N.E. 366 (1925), cited by appellee Klauschie. In that case, the plaintiff's deceased son was employed by an undertaker. In the course of his duties, he handled a corpse which had a gangrenous leg. Some of that matter entered a little cut in his hand and later spread to his neck when he scratched a pimple. The New York court said: "A trifling scratch was turned into a deadly wound by contact with a poisonous substance. We think the injection of the poison was itself an accidental injury within the meaning of the statute." *Id.* at 85, 147 N.E. at 366-67. In discussing whether the cut or the infection constituted the accident, the court went on to say: "The choice, however, is one that is needless and misleading. The whole group of events, beginning with the cut and ending with death, was an accident, not in one of its phases, but in all of them. If any of those phases had its origin in causes engendered by the employment, the act supplies a remedy." *Id.* at 86, 147 N.E. at 367.

We conclude that the infection and subsequent amputation and disability were phases in a whole group of events having their origin with the manifestation of the "pressure sore" discovered prior to April 15, 1979. Therefore, the Workmen's Compensation Court was correct in determining that Mr. Klauschie suffered a compensable injury and is entitled to benefits as determined by its award. That portion of the award we affirm. However, because of our determination that the compensable injury occurred prior to April 15, 1979, we remand the cause to the Nebraska Workmen's Compensation Court

with directions to enter such award against Fireman's Fund, rather than against Argonaut.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.