WILLIAM MANN, APPELLANT, v. CITY OF OMAHA, APPELLEE.

319 N.W.2d 454

Filed May 14, 1982. No. 81-662.

M. H. Weinberg of Weinberg & Weinberg, P.C., for appellant.

Herbert M. Fitle, City Attorney, and George S. Selders, Jr., for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, and CAPORALE, JJ., and BRODKEY, J., Retired.

WHITE, J.

The appellant, William Mann, a 19-year veteran of the Omaha Police Department, brought this action in the Workmen's Compensation Court to recover disability benefits for a heart attack he suffered on October 2, 1980. After trial the one-judge compensation court held that appellant was entitled to compensation benefits in the sum of $180 per week for 30 weeks for temporary total disability to the date of the hearing, which was held on April 29, 1981, and thereafter, and in addition thereto, the sum of $180 per week for so long in the future as the appellant shall remain totally disabled as a result of the heart attack. The City of Omaha refused to accept the award and filed an application for rehearing to the compensation court. The parties stipulated that no rehearing was needed to gather additional facts, and they submitted the case on the transcript of the

hearing before the single judge and the exhibits that were introduced at that trial. The three-judge panel on rehearing reversed the single judge's award and dismissed the appellant's petition. We reverse.

Appellant assigns a number of errors, but principally they may be directed to the three-judge court's findings. The three-judge panel in its order dated September 9, 1981, stated: "Thus, while it may be said that the stresses and strains of the plaintiff's employment contributed to the development of his coronary disease, it may as truly be said that the other risk factors were equally at work. There is not sufficient evidence for the Court to single out stress as the primary or leading causal agent in the plaintiff's disease."

The court went on to hold that in order for a presumably job-related heart attack to be compensable, the evidence must "identify a specific incident or incidents, stressful in character, or a specific change in routine or job duties involving a higher level of continuing stress, to which to tie either the myocardial infarctions or the more rapid increase of atherosclerosis."

It will be necessary to recite the facts of the case in some detail. William Mann was 48 years old at the time of the incident. He was the father of three children and had served as a police officer for the City of Omaha for nearly 19 years prior to his disability retirement. He had suffered a previous heart attack on September 24, 1978, and subsequently underwent a coronary bypass on November 16, 1978, for a blockage in the proximal anterior descending coronary artery. He was returned to work as a police officer, completely recovered, with no limitations or disabilities. Officer Mann testified that for 3 days prior to the attack of October 2, 1980, he had noticed numbness in his left arm and tightness in his chest. Officer Mann testified that the tightness and numbness subsided when he left the

job. During the evening of October 2, 1980, Officer Mann experienced what he described as "pressure in my chest and a lump in my upper chest just under my throat." When his wife returned from work she took him to the emergency room at Immanuel Hospital. He was examined, given an electrocardiogram test, and was released and sent home with three nitroglycerin tablets. After a few hours at home, Officer Mann experienced increased pain and was taken by the rescue squad to the coronary care unit at Methodist Hospital where he underwent a heart catheterization test. It was determined that he had suffered another myocardial infarction and that there was a blockage at a different location than the 1978 infarction. The tests showed the blockage to be in the inferior posterior wall of the coronary artery rather than the proximal anterior descending coronary artery as the first arteriogram in 1978 showed. Dr. James Morgan testified: "On the first heart catheterization the right coronary artery was essentially normal. There is possibly some very minimal irregularity of the lining of the vessel. There is absolutely no evidence of any obstruction at all. This was on 11-8-78. On 11-6-80 the repeat arteriogram shows a complete obstruction of the right coronary artery very near its origin, and in an area that looked very normal on the previous catheterization." When asked to explain that finding, Dr. Morgan testified: "This is not an average process of arteriosclerosis. An average person with arteriosclerotic artery disease has a gradual accumulation of material in the lumen of the vessel so that it gradually is narrowed down and then would occlude, causing a heart attack. I have never seen one that could happen in as short a period of time as this. And the picture look of the vessel does not look like the average coronary artery obstruction, it is much more discrete. . . . The most likely and in my medical judgment the cause of that obstruction is

that an arteriosclerotic plaque that may have been part of this minimal irregularity that was in the vessel earlier was elevated, and the force of the bloodstream then pushed it out into the bloodstream and occluded the blood vessel. This would be called hemorrhage under a plaque. It might be considered a form of coronary artery dissection.'' When asked if there was any way he could relate Officer Mann's work as a police officer to the cause of a heart condition, Dr. Morgan testified: "There are very few circumstances that would cause a rapid enough change in blood pressure to lift up a plaque, to dissect it out and to occlude a coronary artery. I would feel that it would have to be an acute rise in blood pressure. Now, we have a man who was not hypertensive during any of his hospitalizations, his blood pressures were normal in several determinations, and I did go back and look at his records to make sure of that. They range from 110 to 130. Then all of a sudden here is some indication that there has been a marked, if transient, increase of blood pressure to raise this plaque up and to obstruct the vessel. Now, the stress of an acute stress would be the type of thing that would do that. And I find it very easy to picture a policeman going through that type of acute stress. I think that any type of thing where you were going after someone, or chasing someone, or saw the possibility of guns being fired, would cause a very marked rise in the blood pressure, and that marked rise in the blood pressure is what I consider as the cause of the second heart attack." Dr. Morgan was also asked: "In other words, you found his blood pressure on numerous occasions prior to his second myocardial infarction basically normal? A. Yes. Q. And the rise in blood pressure that would be normally associated with police work would be the type of stress-related activity that could cause the problem? A. I agree with that. Q. So that if there were a number of incidents at or

about the time of the heart attack that were stressful, and that if there were no outside incidents at home or in other forms at that time, that with reasonable medical probability, medically using your own judgment, you could draw the conclusion that the heart attack, or the hemorrhage, was caused by police work?  A. Yes."  Dr. Morgan further testified in response to the following question:  "You noted in there [a letter dated January 30, 1981] that he had a family history of early myocardial infarctions, and you noted he was a heavy smoker, and that he was mildly overweight, but he had never been hypertensive and had no other significant risk factors.  I hate to be ignorant about this, but what are the risk factors, could you explain in simple terms to an attorney without much background in cardiology what the risk factors are?  A.  Risk factors are those that are associated with higher incidence than average of coronary artery disease. There are a large number of them, they vary from authority to authority on just what constitutes a risk factor, but commonly accepted risk factors are high blood pressure, cigarette smoking, high cholesterol, some people say high triglycerides, some people say high uric acid, stress in various forms, and family history is a very important risk factor.  Other risk factors are all part of a large equation, and out of the end of the equation comes arteriosclerosis.  And we don't even know what all the risk factors are, much less which ones are important and which ones have major importance and which ones have minor importance . . . . Q.  May I ask why you specifically related the second incident to stressful police work as being the principal and main factor?  A.  As the coronary arteriograms were normal in 1978, and showed a complete obstruction with a very abrupt cutoff in 1980, I couldn't think of alternative explanations for why that should be that were acceptable to me other than hemorrhage under a plaque.

When I think about what can cause hemorrhage under a plaque, it narrows down in my mind to something that can cause a very abrupt rise in blood pressure, and I think that it is very logical to assume that police work would be associated with intermittent rises in blood pressure."

On cross-examination Dr. Morgan was asked: "Q. Then, Doctor, with the factors that have been listed in Mr. Mann's case, and assuming that we go to the American Heart Association risk factors and your risk factors, and we take someone such as Mr. Mann who was male, to begin with, . . . can you still say with reasonable medical certainty that these other factors could not have caused the heart attack in 1980, or could not have been equally contributing factors in the heart attack in 1980 as well as the stress? A. I find it inconceivable that they were significant contributors to the heart attack in 1980. If this same heart attack had happened in 1988, then I would say that those risk factors may have been a significant problem, because those risk factors would be expected to cause an acceleration of an arteriosclerotic process. But I can't conceive of that accelerating to the point that the vessel is normal in 1978 and totally obstructed in 1980 because of any of those other risk factors. Q. All right, and you would think that even though there were no X rays taken between 1978 and '80 in order to trace what the history of this possible plaque breaking away might be? A. Yes, I think even with that. In all the rest of the coronary arteries there has been no change, there hasn't been increased blockages in the other coronary arteries. If those risk factors are going to total one blood vessel, they should have changed some of the others, at least partially."

Other testimony adduced at trial showed that Officer Mann had been assigned to district 105 in Omaha for 1½ years prior to the October 2, 1980, infarction. This area abuts patrol district 104 to the

north which runs from Ames Street to Redick Street and from 30th Street to North 11th Avenue in Omaha. District 104 contains a racially mixed population with older and modest homes. District 105 runs from 30th Street east, Redick Street to Ponca Road. Among the inhabitants of the area were a group of motorcyclists which were referred to in the evidence as Hell's Angels. Officer Mann testified that he was frequently summoned to district 104, which he described as essentially a ghetto area. Officer Mann also testified that in district 105, at about the time of his heart attack, there was generally a heavy call load. Officer Mann testified that there were a great deal of burglary calls, vandalism, and family disturbances. While district 105 was not considered an area of high risk for officers, the family disturbance calls were always thought of as being extremely dangerous to officers. Officer Mann testified that districts 104 and 103, the ghetto areas, where he was frequently called into to assist, were high-risk areas. He also testified that at the time of the heart attack school had just started and there were a considerable number of fights and vandalism, as well as a special investigation involving a rapist who attacked older women in that area. He did not testify as to any specific incident that precipitated the pain while he was on duty, but simply that in the 3 days prior to the actual heart attack he suffered a numb, aching feeling in his left arm and tightness in his chest while on the job. Officer Mann further testified that there were no family difficulties, that he was under no undue stress in his home, that his three children were well, and that his relations with his wife were excellent.

There was considerable testimony by a Dr. John Stratton, director of psychological services for the sheriff's department in Los Angeles, California, concerning the stresses incident to normal police activity. The evidence was accepted as credible by

the three-judge compensation court which found: "There is a considerable amount of credible and persuasive evidence in the record to indicate that police officers, especially those serving in densely populated urban areas, suffer significantly more stress than the population generally. According to this evidence, police officers suffer a significantly higher incidence of digestive and circulatory problems, divorce and suicide, and their life expectancy is significantly shorter than the national average. The evidence points to the conclusion that the police profession is a high risk profession in terms of stress." The City makes no argument that the stress suffered by Officer Mann was not greater than the stress of his nonemployment life. See *Beck v. State,* 184 Neb. 477, 168 N.W.2d 532 (1969), where the court held that a heart attack would be compensable only if the employment contribution takes the form of exertion greater than that of nonemployment life. The evidence in this case overwhelmingly supports the conclusion of the compensation court that Officer Mann was subject on the job to a great deal of stress, greater than that in the normal nonemployment life of himself and other persons.

The appellee, City of Omaha, offered no medical evidence. To dispute the conclusions of Dr. Morgan and Dr. Stratton that stress was the cause of the myocardial infarction of October 2, 1980, they merely point to the existence of what they called the contributory risk factors. All of the contributory risk factors were discounted by the other evidence. The compensation court, in the absence of expert testimony supporting its conclusions, found that there is not sufficient evidence for the court to single out stress as the primary or leading causal agent in the appellant's disease.

"In cases under the compensation act involving heart attacks, the principal issue is usually one of causation. The disability or death is not compensa-

ble unless the injury or death arose out of the employment. There is no fixed formula by which the issue may be resolved and the issue must be determined by the facts of each case." *Sellens v. Allen Products Co., Inc.,* 206 Neb. 506, 509, 293 N.W.2d 415, 417 (1980); *Reis v. Douglas County Hospital,* 193 Neb. 542, 227 N.W.2d 879 (1975).

If it is claimed that the injury was the result of exertion in the employment, the evidence must show that the employment contributed in some material and substantial degree to cause the injury. The question to be determined is whether the injury was the result of a personal rather than an employment risk. The presence of a preexisting disease or condition enhances the degree of proof required to establish that the injury arose out of the employment. *Sellens v. Allen Products Co., Inc., supra; Brokaw v. Robinson,* 183 Neb. 760, 164 N.W.2d 461 (1969).

In *Crosby v. American Stores,* 207 Neb. 251, 298 N.W.2d 157 (1980), we said that it is no longer necessary that the injury be caused by a single traumatic event, but the exertion in the employment must contribute in some material and substantial degree to cause the injury.

The findings of fact made by the Workmen's Compensation Court on rehearing have the same force and effect as a jury verdict in a civil case and, if supported by sufficient evidence, will not be disturbed on appeal unless clearly wrong. *Union Packing Co. v. Klauschie,* 210 Neb. 331, 314 N.W.2d 25 (1982).

In this case there was a sufficient showing that the appellant experienced greater stress in his employment life than in his nonemployment life. It has often been stated by this court that the opinions of experts are not binding on the trier of fact. *Irving v. Tri-Con Industries,* 210 Neb. 339, 314 N.W.2d 253 (1982). See, also, *Union Packing Co. v. Klauschie, supra.* However, where the medical testimony is

uncontroverted, unimpeached, and is given in matters of medical diagnosis which are peculiarly within the range of the knowledge of the expert, the compensation court is not free to substitute its own diagnosis. It is not true that in every case the uncontested opinion of an expert is binding on the trier of fact, but where, as here, the testimony is based on firsthand knowledge, is credible, and has no demonstrable weaknesses or failure of foundation, such testimony cannot be ignored. We therefore hold that the decision of the Workmen's Compensation Court denying compensation to William Mann, appellant, was clearly wrong and the judgment of the three-judge Workmen's Compensation Court is reversed and the cause is remanded to enter judgment for the appellant awarding him total and permanent disability.

REVERSED AND REMANDED WITH DIRECTIONS.