IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

SALTS V. MOSAIC

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

GABRIELE J. SALTS, APPELLANT,
V.
MOSAIC AND SENTRY INSURANCE, APPELLEES.

Filed July 16, 2013.   No. A-12-859.

Appeal from the Workers' Compensation Court: J. MICHAEL FITZGERALD, Judge. Affirmed.

Jamie Gaylene Scholz, of Shasteen, Miner, Scholz & Morris, P.C., L.L.C., for appellant.

George E. Martin III and Anthony D. Todero, of Baird Holm, L.L.P., for appellees.

INBODY, Chief Judge, and IRWIN and MOORE, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Gabriele J. Salts appeals an order of the Nebraska Workers' Compensation Court dismissing her petition for compensation benefits. On appeal, she alleges that the compensation court erroneously rejected uncontradicted medical evidence of causation and erroneously found that she had failed to prove the work-related accident that she pled. We find that the medical evidence was not uncontradicted and that the compensation court did not err in finding that Salts failed to prove a compensable injury arising out of a work-related accident. We affirm.

## II. BACKGROUND

Salts was employed by Mosaic as a medication aide, providing care for physically and mentally disabled residents in a care facility. Her job duties included getting residents out of bed, getting them ready for breakfast, getting them dressed, assisting them with walking, and assisting them with hygiene, as well as various housekeeping duties like sweeping and mopping.

Salts alleged that she sustained a personal injury on or about September 12, 2010, in an accident arising out of and in the course of her employment. She alleged that she was working with a care facility resident named "Susan," a nonverbal patient who suffers from a mental illness which causes her to take her clothes off in public. Salts described Susan as being approximately 5 feet 3 inches tall and weighing approximately 135 to 140 pounds. According to Salts, she was attempting to keep Susan dressed, while Susan was attempting to get undressed. Salts testified that "[i]t was a pull, push, pull, push, pull, push" altercation that lasted for approximately 10 to 15 minutes.

After the incident, Salts made an entry in a "logbook" concerning her interaction with Susan. In that entry, Salts made no mention of any injury or pain. She described the incident and described how Susan "fought" with her about keeping her pajamas on, and she described that Susan required physical guidance to return to her bed.

Salts alleged that she experienced pain between her left shoulder and her neck after the incident. According to Salts, the pain lasted "all that day, all that night" and continued for "probably a few days." Salts utilized hot and cold packs, as well as pain medication, which "seemed to ease the pain." She did not report the incident or seek any medical attention immediately after this incident.

Salts continued to work until January 20, 2011. She testified that she continued to do sweeping and mopping every day at work for "at least a half an hour, 45 minutes" and that she continued to lift residents and assist them with walking, "pulling and pushing them and all of that." She testified that her "hands just kept going numb" and that she would have to "take a break, and just hold [her] arm and [her] hands . . . and try to exercise them to get the numbness out of them," making the work more difficult. Despite this, she did not report the incident or seek medical attention for it.

In November 2010, Salts sought medical treatment for right shoulder pain and a rash. She was diagnosed with probable bursitis. She made no mention of any left shoulder pain during this visit, and she made no mention of the September 12 incident.

In January 2011, Salts sought medical treatment for pain radiating into her left shoulder and then down into her hand, causing numbness. When seeking the medical treatment, Salts reported to the treating physician that she had been experiencing pain "off and on for several weeks." The medical notes of this visit do not reflect any mention of the September 2010 incident or consistent symptoms from that point in time. Other medical notes indicate that she had been seen in March 2010 "with very similar symptoms."

An MRI was ordered, and it was performed on January 25, 2011, showing a disk herniation. On January 27, she filed an accident report with Mosaic describing the September 12, 2010, incident--this was Salts' first documentation of the incident.

On February 3, 2011, Salts was examined by Dr. Daniel Noble. Salts completed a "personal health history" form, on which she reported that the symptoms were first noticed on September 12, 2010; that the injury occurred at work; and that it happened as a result of the incident with Susan described above. Dr. Noble reported Salts' "history of present illness" as being that she "began having neck pain accompanied by left upper extremity radicular complaints in May of 2010" and that the symptoms were "managed without much intervention" until the incident on September 12, 2010. Dr. Noble recommended surgical intervention (after

Salts stopped smoking a pack of cigarettes per day), and concluded that she was "unable to return to work" due to the potential for "further neurologic deterioration."

On March 4, 2011, Salts was examined at another orthopedic center for a second opinion. The "history of present illness" portion of that medical examination report indicated that "[n]o identifiable incident or injury [was] described," but that Salts' "symptoms [had] been present, as [then] described, for approximately the last five months." The examining physician discussed potential nonsurgical treatment options for Salts.

On April 6, 2011, Salts was seen at a spine and pain center. The "history of present illness" portion of the examination report indicated that Salts "report[ed] the pain began after a work-related accident on [September 12, 2010]." Salts was seeking "some way to relieve the pain without surgery." Salts received an epidural steroid injection. Salts was seen for a followup approximately 2 weeks later, reporting some relief of pain and increased functionality, and she received another steroid injection.

On April 8, 2011, Salts filed a complaint with the Nebraska Workers' Compensation Court. Salts alleged that she had sustained personal injury in an accident arising out of and in the course of her employment on or about September 12, 2010. On April 22, 2011, Mosaic, as well as its workers' compensation insurance carrier, Sentry Insurance (Sentry), answered the complaint, denying most of Salts' assertions. Mosaic and Sentry denied that Salts suffered a compensable accident, denied she suffered personal injury as a result of a work-related accident, denied the severity of Salts' alleged injuries, denied that her injuries were medically caused by her employment, alleged that Salts' medical condition was the result of a natural progression of a preexisting condition, and alleged that Salts failed to give reasonable notice of the alleged injury.

On October 21, 2011, Dr. Noble authored a letter to Salts' counsel. In the letter, he indicated that he had reviewed Salts' medical record and that he opined, with a reasonable degree of medical probability, that her disk herniation "was caused and/or aggravated by the incident at work on September 12, 2010," and that "this exacerbated her pre-existing condition."

On November 3, 2011, Salts was seen by another physician, Dr. D.M. Gammel. Dr. Gammel indicated that his findings were derived from a personal interview and physical examination of Salts, the history given by Salts, and a review of prior medical records provided to him. The medical records provided to Dr. Gammel did not include any medical records prior to January 25, 2011. In his report, Dr. Gammel noted that Salts "admits having had a previous similar injury or symptoms" and that she was "unsure about ever having difficulties before the date of the injury/illness that are similar to the symptoms" then being experienced.

In his report, Dr. Gammel was asked to give an opinion, to a reasonable degree of medical probability, concerning what injury Salts sustained in the alleged work-related incident on September 12, 2010. Dr. Gammel noted that the history as related by Salts indicated significant left upper extremity pain when struggling with a patient, and he opined that "[i]f the history as related is accurate it is [his] opinion that . . . Salts sustained a permanent aggravation of a pre-existing cervical spine condition." Dr. Gammel specifically indicated that his recommendations were given "with the assumption that the history given and medical records provided are true, correct, and inclusive."

In May 2012, the Nebraska Workers' Compensation Court conducted a hearing on Salts' petition for compensation benefits. At the hearing, Salts testified in her own behalf and adduced evidence in support of her claim for compensation.

Salts testified about her employment history and job duties. She testified about the incident on September 12, 2010. She testified that she felt pain after the incident, between her left shoulder and neck, and that she treated the pain with ice and pain relievers. She testified that the pain "kept coming and going, coming and going," and that it "never really got better, but it didn't really get worse until later on."

She testified that she did not initially seek medical treatment, and she explained that she "had like bumps and bruises throughout the years, so [she] never hardly ever made out incident reports because [she] figured it was something that was going to come and go." She did not "think it was really serious, you know, so [she] just kind of blew it off." She testified that any repetitive work caused a flareup in her pain and that in January 2011, she sought treatment because the pain was not improving.

Salts acknowledged that she had experienced neck pain approximately 6 months prior to the September 12, 2010, incident, in March 2010. She testified that the pain in March had lasted only approximately a week and that she had not experienced neck pain between that time and the incident in September.

On cross-examination, Salts acknowledged that she had testified in a deposition that she had been unsure whether she experienced an injury in September 2010 because, at the time, she was already experiencing pain "all the time." She also acknowledged that in her deposition she had testified that after the September incident, the pain "kind of went away" after approximately "a week." She also acknowledged that nothing specific happened that caused the pain to return in January 2011. Finally, she acknowledged that the symptoms she experienced in January 2011--pain close to her shoulder blades, up into her neck, causing her left hand to go numb--was "different than the symptoms that [she] experienced" in September 2010.

When Salts was asked on cross-examination about why she did not complete any injury report for the September 12, 2010, incident until January 2011, she answered that she "normally never ever filled out any reports," that "that just wasn't [her] thing," and that she "just never filled out injury reports" because "they usually was something that would come and go." She acknowledged, however, that in August 2010, approximately 40 days before the September 2010 incident, she filled out an injury report about "a metal rod falling on [her] hand." She completed and filed the incident report within 6 minutes of the incident occurring.

Salts also acknowledged, in response to questions from the court, that despite allegedly suffering a disk herniation in the September 12, 2010, incident, she was able to mop for 30 to 45 minutes every night at work and was able to continue lifting residents and walking with them with "gait belts" until January 2011.

Salts also adduced testimony from a coworker. The coworker testified that he was working on September 12, 2010, and that he recalled "a lot [of] commotion . . . happening [between Salts and Susan] in the restroom and [that it] took a long time." According to the coworker, after the incident, Salts indicated that "her neck hurt."

Mosaic and Sentry adduced testimony from a human resource manager. She testified that Salts had pursued a transfer to a different position within Mosaic in November 2010. She

testified that Salts had not indicated any physical accommodation or lack of ability to do her job as a reason for seeking the transfer. She testified that Salts' job duties did not change as a result of the transfer, only the location of her work duties.

The human resource manager also testified about Salts' reporting of the injury to Mosaic. She testified that Salts had been to see a doctor in January 2011 and was told she had a neck injury and that she went to the human resource manager to report the injury. She testified that Salts initially referenced a previous history and referenced a number of care facilities, then she stopped and left to check the "logbook," and upon returning, she pinpointed that the incident happened on September 12, 2010.

On August 29, 2012, the compensation court entered an order dismissing Salts' petition and denying compensation. The court noted that Salts alleged the injury occurred as a result of the incident on September 12, 2010, but that her contemporary entry in the logbook about the incident included no mention of any injury; that a self-evaluation completed by her the next day included no mention of any injury; that during a visit to the medical center for right shoulder pain in November 2010, she made no mention of the injury; and that despite an alleged disk herniation, she was able to continue working and performing her normal job duties through January 2011.

The compensation court also noted that the medical notes associated with her seeking treatment in January 2011 referred to the pain having been "off and on for several weeks" and specifically indicated that there was "no injury" reported. The court also noted that Dr. Noble's records indicated that Salts reported the symptoms beginning on September 12, 2010, and also that she reported the symptoms beginning in May 2010. The court also noted that when Salts was seen for a second opinion, she reported a date of injury of September 12, 2010, but that the doctor's notes indicated that she did not describe an "identifiable incident or injury." Finally, the court noted that when Salts sought treatment at the spine and pain center, she reported that the symptoms began on September 12, 2010. The court recognized the causation opinions given by Drs. Noble and Gammel.

The court noted that the parties had specifically been asked if there was any assertion of repetitive motion or repetitive trauma injury in this case and that the parties had both indicated that Salts' assertion was of a specific event and injury. The court found that Salts had failed to prove that the herniated disk was caused by a work-related accident on September 12, 2010. The court, therefore, dismissed her petition for benefits. This appeal followed.

### III. ASSIGNMENTS OF ERROR

Salts assigns two errors in this appeal. First, Salts asserts that the compensation court erred "in rejecting the uncontradicted evidence of the medical experts." Second, Salts asserts that the court erred "in failing to find a compensable accident."

### IV. ANALYSIS

Although Salts assigns two errors, her assertions on appeal are really interrelated. Salts challenges the compensation court's finding that she failed to prove a compensable accident, and she argues both that the court erred in rejecting the medical opinion testimony she presented and in finding the evidence as a whole insufficient. We find that the medical evidence was refuted by

the testimony, evidence, and factual circumstances in this case and find that the court did not clearly err in finding that she failed to prove a compensable accident occurred in September 2010 and then caused her to stop working in January 2011.

A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Hynes v. Good Samaritan Hosp.*, 285 Neb. 985, ___ N.W.2d ___ (2013); *Clark v. Alegent Health Neb.*, 285 Neb. 60, 825 N.W.2d 195 (2013).

On appellate review, the findings of fact made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Clark v. Alegent Health Neb., supra.* If the record contains evidence to substantiate the factual conclusions reached by the trial judge in workers' compensation cases, an appellate court is precluded from substituting its view of the facts for that of the compensation court. *Id.* An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Id.*

The claimant has the burden to prove by a preponderance of the evidence that his or her employment proximately caused the injury which resulted in a compensable disability. See *Green v. Drivers Mgmt., Inc.*, 263 Neb. 197, 639 N.W.2d 94 (2002). The issue of causation of injury or disability is one for determination of the trier of fact. *Id.* In testing the sufficiency of the evidence to support the findings of fact in a workers' compensation case, every controverted fact must be resolved in favor of the successful party and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Zwiener v. Becton Dickinson-East*, 285 Neb. 735, 829 N.W.2d 113 (2013).

In workers' compensation cases, the appellate court is required to determine whether the evidence was sufficient to support the compensation court's decision, not whether the compensation court could reasonably have concluded differently. See *Pearson v. Archer-Daniels-Midland Milling Co.*, 285 Neb. 568, 828 N.W.2d 154 (2013). The compensation court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.*

In this case, Salts argues that the compensation court erred in finding that she failed to demonstrate a compensable accident. She first argues that she presented uncontradicted medical opinions from both Drs. Noble and Gammel indicating that her injury was caused by a work-related accident in September 2010. She argues that the compensation court could not disregard these opinions because they were not contradicted by evidence adduced by Mosaic. We disagree with Salts' conclusion that the medical evidence in this case was "uncontradicted," because there was ample evidence adduced that contradicted the assertion that she suffered a work-related accident causing injury.

The trial judge in workers' compensation cases is entitled to accept the opinion of one expert over another and is not required to take an expert's opinion as binding, but may either accept or reject such an opinion. *Id.* Salts directs us to *Mann v. City of Omaha*, 211 Neb. 583, 592-93, 319 N.W.2d 454, 459 (1982), and the proposition of law contained therein that "where

the medical testimony is uncontroverted, unimpeached, and is given in matters of medical diagnosis which are peculiarly within the range of the knowledge of the expert, the compensation court is not free to substitute its own diagnosis." In that case, an employee brought an action seeking benefits for a heart attack and alleged that his employment as a police officer had involved sufficient stress greater than his nonemployment life to have been the cause of his heart attack. The employee adduced medical evidence to support his claim. A medical doctor testified that with reasonable medical certainty other risk factors could not have been equally contributing factors, as well as his work stress. The employee also adduced evidence from a psychologist to support his claim that his employment involved substantial stress, greater than that in his nonemployment life.

In that case, the compensation court awarded benefits, but the review panel reversed. The review panel concluded that other risk factors were equally at work in causing the heart attack.

On appeal, the Nebraska Supreme Court noted that the employer had offered no medical evidence and that to dispute the medical evidence adduced by the employee, the City had merely pointed to the existence of contributory risk factors that had been discounted by the employee's medical evidence. Under that circumstance, the Supreme Court ultimately concluded that the review panel was not free to disregard the employee's medical evidence. The court specifically recognized that "[i]t is not true that in every case the uncontested opinion of an expert is binding on the trier of fact," but concluded that where the testimony was "based on firsthand knowledge, [was] credible, and [had] no demonstrable weaknesses or failure of foundation, such testimony cannot be ignored." *Id.* at 593, 319 N.W.2d at 459.

The present case, however, is markedly different. Indeed, the Nebraska Supreme Court recognized in *Mann v. City of Omaha, supra*, that not every uncontested opinion is binding on the trier of fact. For example, in *Murphy v. City of Grand Island*, 274 Neb. 670, 742 N.W.2d 506 (2007), the Supreme Court affirmed the compensation court's having accepted one medical opinion over two others. In so affirming, the Supreme Court specifically recognized that it was within the discretion of the compensation court to disregard medical opinions based upon faulty or incomplete information and to decline to accept their conclusions.

In the present case, Salts points to the medical opinions of Drs. Noble and Gammel. Salts reported to Dr. Noble that her symptoms were first noticed on September 12, 2010, and that the injury occurred at work. Dr. Noble opined in an October 2011 letter to Salts' counsel that the disk herniation was caused or aggravated by the workplace incident between Salts and Susan described above in the factual background portion of this opinion.

Dr. Gammel also opined that Salts had suffered an aggravation of a preexisting condition as a result of the workplace incident between Salts and Susan. Dr. Gammel based his findings on a personal interview and physical examination of Salts, the history given by Salts, and the portion of Salts' medical records provided to him. He specifically indicated that his opinion and recommendations were based on an assumption that Salts had provided an accurate history and the medical records he had reviewed were inclusive.

Although Mosaic and Sentry did not adduce medical opinion testimony to refute the opinions of Drs. Noble and Gammel, their opinions were not "uncontradicted" in this case. Their opinions were contradicted by the evidence adduced concerning the circumstances of the alleged injury and Salts' actions following it.

In this case, the evidence adduced indicated that on the date of the incident between Salts and Susan, Salts made an entry in a "logbook" concerning the interaction. This contemporaneous entry made no mention of any injury or pain. Salts testified that although she experienced left shoulder pain "all that day, all that night" and for "probably a few days" thereafter, she did not report the incident to anyone and she was able to continue working, performing sweeping and mopping of 30 to 45 minutes every day and lifting and assisting patients with walking, for more than 4 months, until January 2011.

Salts testified that she did not complete an injury report after the September 2010 incident because she "normally never ever filled out any reports" and because "that just wasn't [her] thing." Nonetheless, approximately 40 days prior to the alleged September 2010 injury, she did fill out an injury report to report a metal rod falling onto her hand, and she filled out that report within 6 minutes of the incident happening.

In the interim between the incident and the medical treatment sought in January 2011, Salts sought medical treatment for right shoulder pain. When seeking and receiving that medical treatment, she made no mention of any left shoulder pain and made no mention of the September 2010 incident.

Also in the interim between the incident and the medical treatment sought in January 2011, Salts pursued a transfer to a different position within Mosaic. When doing so, she never mentioned the incident or any injury to the human resource manager, and indeed, the position she sought a transfer to required the same job duties of sweeping and mopping and assisting patients.

Even when Salts sought treatment for left shoulder pain in January 2011, she initially reported that she had been experiencing the pain "off and on for several weeks" and made no mention of the September 2010 incident. At trial, Salts testified that the symptoms she was experiencing in January--for which she was seeking treatment--were "different" from the symptoms allegedly experienced after the September incident.

All of this evidence concerning the incident, Salts' actions following it, and the circumstances of her eventual treatment provided a basis for the compensation court to find that the medical opinions were not "uncontradicted." Indeed, Dr. Gammel specifically limited his opinion to an assumption that the history available to him was accurate, and such history was largely based on Salts' reporting that her injury was a result of a workplace incident. Based on the evidence adduced, the question of causation was a fact question, and there was ample evidence to support the compensation court's conclusion that Salts failed to prove that the injury for which she sought treatment in January 2011 was not caused by a work-related accident occurring in September 2010.

In this case, there was a specific representation to the compensation court that Salts was not alleging any kind of repetitive trauma, but was specifically alleging that the incident in September 2010 led to her stopping work in January 2011. There was evidence to support the compensation court's finding that Salts failed to prove the causal connection between her injury and her employment. We are not free to substitute our own conclusions for the compensation court's on this fact question, and we find no merit to Salts' assertions on appeal.

## V. CONCLUSION

The compensation court was not clearly wrong in finding that Salts failed to prove the causal connection between her injury and her employment. We affirm.

AFFIRMED.