ELIZABETH LEITZ, ADMINISTRATOR OF THE ESTATE OF KENNETH E. LEITZ, DECEASED, ET AL., APPELLEES, V. ROBERTS DAIRY AND UNDERWRITERS ADJUSTMENT COMPANY, APPELLANTS.

465 N.W.2d 601

Filed February 15, 1991.   No. 90-343.

Melvin C. Hansen and Kevin J. Dostal, of Hansen, Engles & Locher, P.C., for appellants.

John Kocourek, of Peterson Law Offices, and David R. Stickman for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

Roberts Dairy (Roberts) and its insurance carrier appeal from the unanimous finding by the Workers' Compensation Court upon rehearing that a fatal heart attack suffered by Roberts' employee Kenneth E. Leitz shortly after he unloaded

carts containing frozen ice cream products arose out of and in the course of his employment with Roberts. We affirm.

The appellants' four assignments of error combine to allege that the Workers' Compensation Court was clearly wrong in finding that Leitz' fatal injury arose out of and in the course of his employment with Roberts.

> In determining whether the evidence is sufficient to support an award by the Workers' Compensation Court, the evidence must be considered in the light most favorable to the successful party. [Citation omitted.] As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given their testimony. [Citation omitted.]

*Reynolds v. School Dist. of Omaha*, 236 Neb. 508, 509, 461 N.W.2d 758, 760 (1990).

Viewed in the light most favorable to the appellees, the record reflects the following: Leitz was employed by Roberts as a semitrailer driver, working out of its Omaha distribution facility. On April 20, 1988, Leitz, then 48 years of age, was accompanied on his route by Gilbert Stogdill. Leitz' widow, Elizabeth Leitz, testified that at that time, Leitz was 6 feet tall and weighed between 195 and 210 pounds. As part of his duties, Leitz was required to unload carts which contained frozen ice cream products. The ice cream carts weigh approximately 150 pounds when empty. When the carts are loaded, they generally weigh approximately 300 to 400 pounds, but can range from 200 to 700 pounds in weight. The steel carts are approximately 6 feet in height and 30 by 28 inches in width and depth and are moved about on four 5-inch wheels. The carts were placed in threes across the width of the trailer in question on April 20. Although a mechanism holds the carts in place during transport, Stogdill testified that it was possible that the wheels of the carts became nonaligned during the trip.

On the workday in question, which started approximately at 4:30 a.m., Leitz and Stogdill were to deliver ice cream to "six stops on the drop route." Before the first delivery, the two men drove to Rockport, Missouri, where Leitz ate breakfast. The pair then drove to Falls City, Nebraska, where they delivered one cart to a facility, and then drove to the Sabetha, Kansas,

plant, where they left two carts. Between 11 and 11:30 a.m., Leitz and Stogdill arrived at a Roberts facility in Salina, Kansas, to unload 13 carts. Stogdill testified that the two men first straightened the carts in the trailer. After removing the load bars on the inside of the trailer, Leitz maneuvered the carts from their stationary position, out a side door, and onto a hydraulic lift. Stogdill testified that the most difficult aspect of propelling a cart is its initial movement from a stationary position. After the carts were placed on the hydraulic lift, Stogdill moved the carts from the lift and into a cooler. Leitz and Stogdill replaced the loaded carts in the trailer with empty carts. There was testimony that during this process, Leitz told Stogdill that he was woozy. It took about 30 to 45 minutes to unload and reload the trailer.

The temperature inside the trailer was 20 degrees with the doors open and 10 degrees below zero when they were closed. There was testimony that the outside temperature on April 20 was approximately 85 to 90 degrees. Stogdill recalled that Leitz was wearing only a hooded sweater over his work clothes. Dr. Ward A. Chambers, a cardiologist, testified that the human body makes adaptive changes in cold weather that are not beneficial to the heart and appear to adversely affect oxygen requirements. He further testified that large changes in temperature tend not to be well tolerated by the heart.

After finishing their duties on the loading dock at Salina, Leitz and Stogdill went into an office to complete some paperwork. After approximately 10 to 15 minutes, Leitz returned to the truck to retrieve additional paperwork. He came back to the office and then proceeded to a restroom. When Leitz returned from the restroom, he looked pale. He sat down by a receptionist and, in response to Stogdill's query, said that he felt dizzy. A short while later, Leitz sat down next to Stogdill. When another worker asked what was wrong, Leitz stated that as he was returning to the office from his truck, he felt a sharp pain run up his left arm, and that he became dizzy. After Leitz said that, he lay down and a rescue unit was summoned.

Emergency medical personnel were contacted at 1:25 p.m. Shortly after the paramedics' arrival, Leitz went into cardiac arrest. He was taken to St. John's Hospital in Salina, where he

was pronounced dead at 2:15 p.m.

The record reflects that there were several factors that increased the risk of Leitz' suffering a heart attack. Elizabeth Leitz testified that her husband had high blood pressure, but that he had been taking medication faithfully for it since the fall of 1983. There was medical expert testimony that Leitz' hypertension was being fairly well controlled. Dr. Edward R. Farrage, Leitz' family physician, testified that less than 2 weeks prior to his death, Leitz' blood pressure was 130 over 80, which was within normal limits. Leitz smoked cigarettes and was "chain smoking" on the day he died. Dr. Chambers testified that tobacco use will cause a degree of carbon monoxide which displaces oxygen in the blood. The record reflects that Leitz rarely exercised. Dr. Chambers reported:

> Autopsy revealed he had evidence of cardiac enlargement and severe atherosclerosis of the coronary arteries with complete occlusion of [the] left main coronary artery as well as severe atherosclerosis of his left anterior descending circumflex and right coronary artery. The heart was dilated and showed evidence of an old anterior myocardial infarction. The other left ventricular muscle was hypertrophied and most likely secondary to a long standing history of systemic hypertension.

On March 24, 1989, Elizabeth Leitz, as administrator of the estate of Leitz and as the deceased's widow, and Leitz' dependent children brought this action in the Workers' Compensation Court. After a one-judge hearing, the cause was dismissed on July 31, 1989, because the "plaintiff has not proved to a reasonable degree of medial [sic] certainty or probability that the heart attach [sic] which caused his death resulted from on-the-job exertion, which was greater than that experienced by the average man in normal non-employment life." A timely motion for rehearing was filed. Upon rehearing, a three-judge panel of the Workers' Compensation Court found Leitz' heart attack was covered under the compensation act. It is from the order upon rehearing that Roberts and its insurer appeal.

"When personal injury is caused to an employee by accident or occupational disease, arising out of and in the course of his

or her employment, such employee shall receive compensation therefor from his or her employer . . . ." Neb. Rev. Stat. § 48-101 (Reissue 1988). "The terms ['injury' and 'personal injuries'] shall not be construed to include disability or death due to natural causes but occurring while the employee is at work, nor to mean an injury, disability, or death that is the result of a natural progression of any preexisting condition." Neb. Rev. Stat. § 48-151 (Reissue 1988). Section 48-151 further provides, "The claimant shall have a burden of proof to establish by a preponderance of the evidence that such unexpected or unforeseen injury was in fact caused by the employment."

> "In cases under the compensation act involving heart attacks, the principal issue is usually one of causation. The disability or death is not compensable unless the injury or death arose out of the employment. There is no fixed formula by which the issue may be resolved and the issue must be determined by the facts of each case."

*Mann v. City of Omaha*, 211 Neb. 583, 591-92, 319 N.W.2d 454, 458 (1982).

We begin our analysis by recalling that the issue in regard to causation of an injury or disability is one for determination by the fact finder, whose findings will not be set aside unless clearly erroneous. See *Way v. Hendricks Sodding & Landscaping, Inc.*, 236 Neb. 519, 462 N.W.2d 99 (1990).

Roberts and its insurer contend that Leitz' severe coronary artery disease and personal risk factors result in an enhanced degree of proof for the claimants, which standard has not been met in this case. Beginning in 1969, this court had consistently held that the presence of a preexisting disease or condition enhances the degree of proof required to establish that the injury arose out of and in the course of employment. See, e.g., *Spangler v. State*, 233 Neb. 790, 448 N.W.2d 145 (1989); *Hyatt v. Kay Windsor, Inc.*, 198 Neb. 580, 254 N.W.2d 92 (1977); *Brokaw v. Robinson*, 183 Neb. 760, 164 N.W.2d 461 (1969) (articulating the "enhanced degree of proof" requirement for the first time). In *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990), the "enhanced degree of proof" language was expressly disapproved. This court

clarified a claimant's burden of proof in such cases, explaining that "for an award based on disability, a claimant must establish, by a preponderance of the evidence, that the employment proximately caused an injury which resulted in disability compensable under the Workers' Compensation Act." *Id.* at 468-69, 461 N.W.2d at 572-73. Accordingly, the issue is not one of enhanced degree of proof but of causation.

The causation issue embraces two elements: (1) legal cause and (2) medical cause. 1B A. Larson, The Law of Workmen's Compensation § 38.83(a) (1987). See, also, *Sellens v. Allen Products Co., Inc.*, 206 Neb. 506, 293 N.W.2d 415 (1980) (citing 1B A. Larson, *supra*, with approval). "Under the legal test, the law must define what kind of exertion satisfies the test of 'arising out of the employment.' Under the medical test, the doctors must say whether the exertion (having been held legally sufficient to support compensation) in fact caused this collapse." 1B A. Larson, *supra*, § 38.83(a) at 7-276 to 7-277.

This court has adopted the following test to establish legal cause when a preexisting disease or condition is present: An exertion- or stress-caused heart injury to which the claimant's preexisting heart disease or condition contributes is compensable only if the claimant shows that the exertion or stress encountered during employment is greater than that experienced during the ordinary nonemployment life of the employee or any other person. *Spangler, supra.* Appellants contend that the evidence fails to show that Leitz' employment exertion was greater than that experienced during the ordinary nonemployment life of Leitz or any other person.

Before addressing appellants' contention, we initially consider whether the test for legal cause is still viable. This court has stated that this test is simply an application of the enhanced degree of proof in preexisting condition cases. *Spangler, supra*; *Sandel v. Packaging Co. of America*, 211 Neb. 149, 317 N.W.2d 910 (1982); *Engel v. Nebraska Methodist Hospital*, 209 Neb. 878, 312 N.W.2d 281 (1981). Since the "enhanced degree of proof" language was disapproved in *Heiliger, supra*, it would seem to follow that the "exertion greater than nonemployment life" test, which is purportedly an application of the enhanced degree of proof, no longer has any validity.

However, that is not the case. *Beck v. State*, 184 Neb. 477, 168 N.W.2d 532 (1969), the seminal case, cites *Brokaw, supra*, for the proposition that if a preexisting condition is present and the employment strain is no greater than that of nonemployment life, there can be no recovery under the workers' compensation laws. For that reason, later cases have misconstrued the "stress greater than nonemployment life" standard as an application of the enhanced degree of proof, which was the holding of *Brokaw, supra*. The *Beck* test was not based on the enhanced degree of proof. The rationale for the test was explained:

> "[W]hen the employee contributes some personal element of risk—e.g., . . . a personal disease which figures causally in his injury—the employment must contribute something substantial to increase the risk. The reason is that the employment risk must offset the causal contribution of the personal risk. . . . If there is some personal causal contribution *in the form of a previously weakened or diseased heart*, a heart attack would be compensable only if the employment contribution takes the form of an exertion greater than that of non-employment life. Note that the comparison is not with *this employee's* usual exertion *in his employment*, but rather with the exertions present in the normal *non-employment* life of this or any other person."

(Emphasis in original.) *Beck, supra* at 480, 168 N.W.2d at 533-34 (quoting Larson, *The "Heart Cases" in Workmen's Compensation: An Analysis and Suggested Solution*, 65 Mich. L. Rev. 441 (1967)). See, also, 1B A. Larson, The Law of Workmen's Compensation § 38.83(b) (1987) (explaining that the foregoing is a test for legal causation). In other words, to show that the proximate cause of an employee's heart attack is work related, the employee must prove that he or she suffered some work-related stress or exertion which is greater than that in the ordinary nonemployment life of the employee or any other person. This is necessary to break any causal connection between the natural progression of the preexisting condition or disease and the injury at the workplace. Otherwise, the fact that the heart injury occurred at work would be strictly fortuitous.

The enhanced degree of proof language merely attempted to explain this problem of proximate or legal cause. See *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990). Thus, it is clear that the "stress greater than nonemployment life" test is a function of proximate or legal cause, not an enhanced degree of proof, and remains valid.

Dr. Lydia K. Thigpen, a professor of physical education whose doctoral degree had an emphasis in the study of human movement, testified regarding the issue of employment exertion. She testified that to move a 200-pound cart from a stationary position, it took 20 to 25 pounds of force output. Moving a 700-pound cart from a standing position requires around 180 pounds of force output, Dr. Thigpen explained. She testified that moving a 700-pound cart requires the equivalent amount of force necessary to squat lift 180 pounds if one was weight lifting. In contrast, Dr. Thigpen testified that the highest force output for activities around the Leitz home for which she could obtain a reading was $16^{1}/_{2}$ pounds of force output. She further testified that based on a reasonable degree of scientific certainty, Leitz' measured daily activities probably would have generated less than 20 pounds of force output. Dr. Thigpen testified that Leitz' activities in loading and unloading the carts required significantly greater exertion than his daily activities at home and those encountered by an average person in his or her nonemployment life. There was evidence that if the wheels were not aligned, more pounds of force output were required to move the cart. Roberts elicited testimony from various Roberts employees that it was no more difficult to move a cart than to mow a lawn or carry a bag of golf clubs. Dr. Michael H. Sketch, the chairman of the division of cardiology at Creighton University, testified that due to Leitz' severe heart disease, it would have been impossible for him to do any major physical work. As the trier of fact, the compensation court panel is the sole judge of the credibility of the witnesses. From its decision, it is apparent that the panel found the claimants' witnesses more credible. On the basis of the record presented to this court, it cannot be said that the compensation court panel was clearly erroneous in finding that Leitz' exertion or stress associated with unloading the ice cream carts on April 20 was greater than

that experienced during the ordinary nonemployment life of Leitz or any other person.

While legal cause is established by satisfying the "stress greater than nonemployment life" test, a claimant must still demonstrate medical causation. If it is claimed that an injury was the result of stress or exertion in the employment, medical causation is established by a showing by the preponderance of the evidence that the employment contributed in some material and substantial degree to cause the injury. *Mann v. City of Omaha*, 211 Neb. 583, 319 N.W.2d 454 (1982); *Sellens v. Allen Products Co., Inc.*, 206 Neb. 506, 293 N.W.2d 415 (1980).

Dr. Chambers testified that "physical exertion causes an increase in myocardial oxygen consumption and the only way it can get this is through blood flow through the coronary arteries." He further testified that if the demand for oxygen is greater than the supply, the heart muscle malfunctions. Dr. Chambers testified that Leitz was in ventricular fibrillation, which he defined as a "totally chaotic electrical rhythm that causes a totally chaotic contraction pattern to where the heart pumps no blood and is virtually uniformly fatal in human beings." Based on a reasonable degree of medical certainty, Dr. Chambers concluded, "[T]he physical exertion associated with [Leitz'] employment on the day of his death was a direct cause of the arrhythmia that caused his demise." The doctor testified that his opinion was not altered by the presence of the risk factors such as smoking, obesity, consumption of a large breakfast, or hypertension. Dr. Chambers testified that the time lapse between Leitz' exertion and the onset of his heart attack had no significance because an arrhythmia can occur up to 24 hours after the precipitating event.

The appellants assert that the claimants' experts, by failing to specifically exclude the role of Leitz' preexisting disease, did not provide the necessary expert medical testimony to meet the claimants' burden of proof. This argument borders on the frivolous. Dr. Chambers was aware of Leitz' preexisting disease. By his conclusion that Leitz' heart attack arose out of and in the course of employment, it necessarily follows that he determined that the preexisting disease was not the cause of Leitz' fatal injury. A claimant is not required to prove that a

preexisting disease or condition will not sometime in the future through natural progression result in disability. See *Engel v. Nebraska Methodist Hospital*, 209 Neb. 878, 312 N.W.2d 281 (1981).

Although Dr. Sketch, Roberts' medical expert, opined, to a reasonable degree of medical certainty, that the unloading of the truck had no bearing on Leitz' death, it is not this court's function to choose which expert is the most credible. When the record presents conflicting medical testimony, the Supreme Court will not substitute its judgment for that of the Workers' Compensation Court. *Binkerd v. Central Transportation Co.*, 236 Neb. 350, 461 N.W.2d 87 (1990). Thus, the compensation court panel was not clearly erroneous in finding that Leitz' employment contributed in some material and substantial degree to cause his fatal heart attack.

Because Roberts has failed to obtain a reduction in the amount of the award, it must pay attorney fees of $2,500 for the services of the claimants' attorney in this court. See Neb. Rev. Stat. § 48-125 (Reissue 1988).

The compensation court panel's finding that legal and medical cause has been shown in this case is not clearly erroneous. Its decision is therefore affirmed.

AFFIRMED.

SHANAHAN, J., concurring.

On rereading the Nebraska test for legal causation in a workers' compensation case based on a "heart attack," one immediately recognizes that the present test is not only impractical but unrealistic and an invitation for conjecture and speculation otherwise judicially condemned in prosecution of a workers' compensation claim. As expressed today,

> [a]n exertion- or stress-caused heart injury to which the claimant's preexisting heart disease or condition contributes is compensable only if the claimant shows that the exertion or stress encountered during employment is greater than that experienced during the ordinary nonemployment life of the employee or any other person.

The majority has declined to explain or illustrate application of the preceding standard. The reason for such absence of an explanation or illustration will become quite evident.

Under current Nebraska law, compensability for an employee's heart attack, including an employee's death from that cardiovascular condition, is a process of comparing or weighing the employee's actual work exertion and ordinary nonemployment exertion. If employment involves exertion greater than exertion in nonemployment life, a claimant has established a legal cause necessary for compensability under the Nebraska Workers' Compensation Act. Thus, under Nebraska's current rule for compensability of a heart attack, comparison of relative exertions is crucial, i.e., employment exertion versus exertion in an employee's ordinary nonemployment life, as well as employment exertion versus exertion in the ordinary nonemployment life of any person other than the employee who has suffered a heart attack.

Consider the following illustration: A is an enthusiast for physical fitness and runs several miles each week, which requires an average 80 units of heart strain every time A embarks on running. B leads a rather sedentary lifestyle and in any ordinary activity outside B's employment never incurs more than 30 units of heart strain. Assume that "any other person" in ordinary nonemployment life experiences exertion at 45 units of heart strain. Both A and B have a preexisting deleterious heart condition and work for the same employer. One day, while A and B are simultaneously doing the same work which requires 50 units of heart strain, each collapses from a heart attack and dies. B's death did "arise out of employment" because the fatal work exertion of 50 units exceeds the 30-unit exertion in B's nonemployment life. Therefore, under the present Nebraska rule, B's death from a heart attack is compensable. Although it appears that A's death did not "arise out of employment," since the 50 units of heart strain from employment exertion is less than the 80 units ordinarily experienced in A's nonemployment life, nevertheless, under the Nebraska alternative standard, "this or any other person," A can also establish legal cause necessary for compensability because A experienced employment exertion, 50 units, which is greater than exertion experienced by "any other person" in ordinary nonemployment life, 45 units. Legal cause for A's death is established, notwithstanding the reality that A's heart

attack resulted from employment exertion no greater than, and actually less than, the exertion experienced in A's ordinary nonemployment activity. The preceding illustration, however, may be suspect on account of the assumption concerning the level of heart strain from exertion in the ordinary nonemployment life of "any other person."

Commentators have observed:

> [I]n an effort to create a universal standard, Larson uses a comparison between the particular employment exertion at issue with "the exertions present in the normal *nonemployment* life of this or any other person." . . .
>
> . . . .
>
> Larson seeks to examine particular job stress, but does not examine that stress as it relates to *a particular individual*. Individuals are able to accommodate themselves over a period of time to physical stresses. In addition, individuals react differently to emotional stresses. Therefore, it is necessary to place the numerators (e.g., stress) with their denominators (reactivity of the individual). To consider only if the exertion is the type that is present in the "normal nonemployment life of this or any other person" is to ignore medical realities.

(Emphasis in original.) D. Juge & J. Phillips, *A New Standard for Cardiovascular Claims in Workers' Compensation*, 43 La. L. Rev. 17, 39-40 (1982).

Regarding the "any other person" alternative test for compensability of a heart attack, that is, exertion of the "normal nonemployment life of this [employee] or any other person," the court in *Duvall v. Charles Connell Roofing*, 564 A.2d 1132, 1136 (Del. 1989), stated:

> Adoption of this rule . . . raises several immediate problems which may defy reasonable solution. First is the matter of definition. Who is the average person in "normal" non-employment life? Second, how is the comparable level of activity in "normal" non-employment life to be determined, and by whom? How does one compare the level of exertion in moving or lifting heavy objects on the job versus strenuous, but "normal" non-employment activities? To what extent is

one's personal life to be dissected to fit the equation? While undoubtedly well-intended, this proposal seems unworkable. . . .

See, also, *Southern Bell Tel. & Tel. Co. v. McCook*, 355 So. 2d 1166 (Fla. 1978) (event on which workers' compensation claim was based did not "arise out of" employment, when the employee suffered from an idiopathic condition manifested for the first time during the course of employment, since the employee simply bent over to pick up tissue paper, a movement which, due to the idiopathic condition, produced disability).

Under the Workers' Compensation Act, causation necessary for compensability is determined in reference to a particular employee who has sustained a specific disability from distinctive employment. The question is, Did this particular work-related incident cause this particular person this particular injury? Generally, in a workers' compensation case, causation does not inquire whether this particular work-related incident actually caused injury to an employee in the same manner as the injury would have been suffered by any other person. For that reason, exertion experienced in the ordinary nonemployment life of any person other than the employee becomes irrelevant to the issue of legal causation necessary for compensability under the Nebraska Workers' Compensation Act. Also, by injecting nonemployment exertion of "any other person" into the workers' compensation equation, an employer's liability turns on the relationship between a fictional individual's undefined efforts and a real person's—the worker's—known activities. If "any other person" meant "a person reasonably identifiable with or similar to" the worker who has sustained a heart attack, perhaps some semblance of particularity might be infused into Nebraska's alternative test, but that meaning does not exist in the Nebraska workers' compensation law. Consequently, the test remains and involves the ordinary nonemployment life of "any other person"—female, male, adult, or child. Additionally, the compensability standard involving the ordinary nonemployment life of "any other person" imposes an apparently impossible burden of proof consisting of conjecture or speculation inherent in the "any other person" hypothesis.

In a worker's "heart attack" case, the question is "whether the injury was the result of a personal rather than employment risk. . . . ' "The reason is that the employment risk must offset the causal contribution of the personal risk. . . ." ' " *Sellens v. Allen Products Co., Inc.*, 206 Neb. 506, 509-10, 293 N.W.2d 415, 417-18 (1980). See, also, *Hyatt v. Kay Windsor, Inc.*, 198 Neb. 580, 254 N.W.2d 92 (1977). "[W]hen the employee contributes some personal element of risk . . . the employment must contribute something substantial to increase the risk. The reason is that it must offset the causal contribution of the personal risk." 1B A. Larson, The Law of Workmen's Compensation § 38.83(b) at 7-278 (1987). Therefore, when legal causation has been established in a workers' compensation case based on a "heart attack," there still remains the necessity of establishing medical causation for compensability, that is, "exertion or stress in [the worker's] employment contributed in some material and substantial degree to cause the heart injury." *Spangler v. State*, 233 Neb. 790, 796, 448 N.W.2d 145, 150 (1989). Accord, *Mann v. City of Omaha*, 211 Neb. 583, 319 N.W.2d 454 (1982); *Sellens v. Allen Products Co., Inc., supra*; *Newbanks v. Foursome Package & Bar, Inc.*, 201 Neb. 818, 272 N.W.2d 372 (1978).

Consequently, there appears to be a more practical and realistic rule: If an employee has a preexisting coronary condition conducive to a heart attack and suffers a heart attack which is the basis for a workers' compensation claim, the claimant must prove, by a preponderance of evidence, that, when considered apart from the antecedent condition, the worker's employment exertion is greater than the employee's usual nonemployment exertion and that such employment exertion substantially contributed to the employee's heart attack. The preceding test for compensability of disability or death from an employee's heart attack meets the requirement that an employee's personal injury must arise out of employment and avoids hypothetical humans as pseudofactors for an employer's liability in a very real and particularized employment situation. Moreover, the requirement that employment substantially contributes to an employee's heart attack forestalls evolution of the Workers' Compensation Act

into health or life insurance.

Under the preceding rule proposed, with the exception of eliminating the "any other person" element from the comparison between a worker's employment exertion and nonemployment exertion, the Nebraska rules for compensability of a heart attack would remain unchanged.

Notwithstanding my objection to the current legal causation test in heart attack cases, appellees supplied a reasonable factual basis for a comparison between the exertion experienced by Kenneth Leitz in his employment and the exertion which he usually experienced in his nonemployment life, evidence which provided a basis for the conclusion that Leitz' employment exertion was greater than his usual nonemployment exertion. Thus, the proof established that Leitz' myocardial infarction arose out of his employment with Roberts Dairy. Hence, the award in the Nebraska Workers' Compensation Court must be affirmed.

FAHRNBRUCH, J., concurring.

Since 1969, this court has held that an exertion- or stress-caused heart injury to which the claimant's preexisting heart disease or condition contributes is compensable only if the claimant shows that the exertion or stress encountered during employment is greater than that experienced during the ordinary nonemployment life of the employee *or any other person*. See *Beck v. State*, 184 Neb. 477, 168 N.W.2d 532 (1969). Even if one ignores the values of stability and predictability which adhering to precedent engenders, the current test for legal causation is a sensible and prudent approach. The foregoing rule has been applied for over 20 years without difficulty.

As the court in *Allen v. Industrial Com'n*, 729 P.2d 15, 26-27 (Utah 1986), asserted:

> We believe an objective standard of comparison will provide a more consistent and predictable standard . . . . In evaluating typical nonemployment activity, the focus is on what typical nonemployment activities are generally expected of people in today's society, not what this particular claimant is accustomed to doing. Typical

activities and exertions expected of men and women in the latter part of the 20th century, for example, include taking full garbage cans to the street, lifting and carrying baggage for travel, changing a flat tire on an automobile, lifting a small child to chest height, and climbing the stairs in buildings. By using an objective standard, the case law will eventually define a standard for typical "nonemployment activity" in much the way case law has developed the standard of care for the reasonable man in tort law.

*Carruthers v. PPG Industries, Inc.*, 551 So. 2d 1282 (La. 1989), demonstrates the weakness in a rule dispensing with the comparison to the nonemployment life of any other person. In *Carruthers*, the plaintiff's decedent died due to a heart attack shortly after climbing a flight of stairs at his place of employment. He suffered from emphysema, hypertension, and diabetes and had residual damage from childhood poliomyelitis. The decedent did not climb steps in his nonemployment life, and his outside activities were restricted to reading and watching television. Because the plaintiff would have been unsuccessful if the objective standard was retained, she argued that the court should compare the decedent's work-related stress to the amount of stress in his nonemployment life. The court originally declined to do so, stating, "Such a standard would ignore the considerations of causation and attendant fairness to employers and thus contravene the underlying purposes of the compensation statute." *Id.* at 1285. Furthermore, there were concerns that "were the rule otherwise, many employers would be reluctant to hire workers with even slight health problems if the natural progression of employees' illnesses, rather than work-related causes, made employers liable for compensation." *Id.* at 1284. While the *Carruthers* court granted a rehearing, vacated its prior opinion, and reversed the judgment, I agree with its former decision.

Other courts adhere to the test for legal causation adopted by this court. See, e.g., *Dept. of Transp. v. Van Cannon*, 459 N.W.2d 900 (Iowa App. 1990); *Bryant v. Masters Mach. Co.*, 444 A.2d 329 (Me. 1982).

It would be unfair to hold an employer liable when the

employee is in such a weakened condition that the employee does not even climb a flight of stairs in the employee's nonemployment life. Without a comparison to the nonemployment life of any other person, work-relatedness of the injury would be strictly fortuitous. Furthermore, employers would be reluctant to hire people with preexisting conditions or diseases.

On the other hand, if one has an unusually vigorous nonemployment life, it makes little sense to compare the employment exertion to that encountered by the average person. The comparison must also be made with this particular employee's nonemployment life. If the exertion is not any greater than he or she encounters in his or her nonemployment life, it cannot be said that the employment exertion caused the injury. Thus, it is sensible to make both comparisons. The test is conjunctive. That is to say, in each case, the comparison is made to the employee's nonemployment life *and* the nonemployment life of any other person.