IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


ALIRE V. HARRIS DAVIS REBAR


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


KENNETH ALIRE, APPELLEE,

V.

HARRIS DAVIS REBAR, LLC, APPELLANT.


Filed July 18, 2017.    No. A-16-625.


Appeal from the Workers' Compensation Court: JOHN R. HOFFERT, Judge. Affirmed.

Seth M. Jurcyk, of McAnany, Van Cleave & Phillips, P.A., and, on brief, Patrick J. Mack, for appellant.

Mark P. Grell, of Miller Grell Law Group, P.C., L.L.O., for appellee.


PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

INTRODUCTION

The Nebraska Workers' Compensation Court found that Kenneth Alire had a compensable accident resulting in physical and mental injuries. The court concluded Alire was at maximum medical improvement (MMI) as to his physical injuries (bruising and concussion from being hit in the face), but not from his psychological injury. Among other things, the court awarded Alire temporary total disability benefits due to the psychological injury until Alire reaches MMI. Alire's employer, Harris Davis Rebar, LLC (HDR), appeals the compensation court's determination that Alire sustained a psychological injury, and further, that even if there was such an injury, there were independent intervening events which broke the causal connection between the work event and Alire's need for ongoing psychological treatment. Additionally, HDR claims that Alire is capable

of working and the compensation court erred in finding him temporarily and totally disabled. We affirm.

BACKGROUND

On December 13, 2013, Alire was working for HDR as an ironworker at the Wolf Creek nuclear power plant in Burlington, Kansas, when he was punched on the side of his face by a coworker.

Alire filed a complaint in the Nebraska Workers' Compensation Court on July 29, 2014, alleging that the incident at Wolf Creek resulted in a compensable injury; HDR timely answered. Trial took place on April 8, 2016. Alire, age 53 at the time of trial, was the only witness to testify; one expert's testimony was provided by deposition. Medical records, bills, reports and other evidence were received. A summary of the testimony and medical records follows.

Alire testified that on December 13, 2013, a coworker eavesdropped on Alire's conversation with a general foreman about Alire's pay scale and benefits, after which the coworker dragged Alire by the arm and jacket around a break room. The coworker's brother then appeared and punched Alire on the side of his face. Alire claimed there was animosity because he had transferred into the brothers' local union from a "local" in New Mexico, and Alire thought they did not like him because he was not from Los Angeles and he "wasn't familiar." As he left to go report the incident, the brothers "threatened [him] not to report it." Alire went to the job site safety trailer for first aid; he was having headaches, dizziness, and could not eat. He was "a little bit in shock from getting hit, it was so cold." While in the trailer, Alire filled out an incident report and informed his supervisors and the appropriate union leaders about the incident. After approximately two hours in the safety trailer, the site superintendent drove Alire to the Medical Arts Clinic in Emporia, Kansas, where Alire was treated and diagnosed with a contusion to the face and head. According to the medical record from that examination, Alire was cleared to perform all job functions associated with regular job duties. Alire testified that because of the assault, "[t]he job got shut down . . . right before Christmas, 30 guys put out of work for a bullying tactic or whatever you want to call it."

On December 16, 2013, HDR assigned Alire to a new job site in Sioux City, Iowa. Upon arriving, Alire requested follow up medical treatment for his symptoms from the Wolf Creek incident, but the person he spoke to said he could not authorize it. Alire attended an orientation training on Thursday later that week, and although he complained of having headaches, he "roughed out" one day of work on that Friday. According to Alire, "That was the last day [he] worked." After Sioux City, Alire went home to Albuquerque, New Mexico, for the Christmas holidays. According to Alire, he never went to any other job sites for HDR or any other company after that.

Between December 13, 2013, and January 17, 2014, Alire testified that his symptoms were getting worse. His "headaches were getting more frequent and longer." He also had trouble sleeping and was having nightmares. Alire's anxiety was getting worse, and he was irritable and depressed. On January 17, Alire sought treatment at Concentra Medical Centre in Albuquerque, where he reported he had been "'punched in the face unexpectedly in freezing conditions hurting my jaw, teeth, cheek, head, and severe headaches and dizziness.'" The record also indicates that

Alire reported increasing anxiety and stress. Alire stated at trial that he had no income, so that caused stress and anxiety, as did the fact that he was assaulted. He was also concerned about getting blamed for everybody getting sent home, and for his safety from any retaliation by the perpetrator of the assault. The Concentra medical record indicates a diagnosis of a temporomandibular contusion and post-concussion syndrome. Prescription medication was dispensed, and Alire was returned to regular duty as of that date. However, according to Alire's testimony, he was not working because "[t]he doctor hadn't released [him], and [he] was under the medication . . . for the anxiety, the Valium . . . [m]y anxiety level was real high." Alire stated that the medications caused him lightheadedness and dizziness; the Valium "alters your thinking."

Alire was next evaluated "at Presbyterian" by Dr. Benjamin Chan, his primary care physician, in March and April 2014. A March 14 medical record shows that Alire complained of a headache, and described being anxious, angry, and frustrated, and had a "bad flashback of the incident." Alire testified that these were "severe headaches where [he] had to lay down." He was unable to function because his head was bothering him. On March 24, Dr. Chan ordered a CT scan and follow up appointment. On April 16, Dr. Chan noted that the CT scan was normal, but Alire was still reporting headaches, flashbacks of what happened to him, nightmares, stress and dizziness. The medical record shows a diagnosis of "post-traumatic stress disorder" (PTSD), and a referral to Dr. Paul Wilson "here in this office." Dr. Wilson, also "at Presbyterian," saw Alire on April 29. Dr. Wilson also diagnosed Alire with PTSD and depression, and counseling was recommended. On May 1, Dr. Chan sent a letter to "whom it may concern" indicating he was the primary care physician for Alire and noted that Alire's "signs and symptoms of [PTSD] and depression" were "confirmed by Dr. Wilson who is our psychologist." Dr. Chan indicated that Alire was to stay off work for "the next 2 months so that he can see the psychiatrist for treatment."

Alire testified that Dr. Wilson referred him to Behavioral Health, where he had previously seen Peter Carmany for alcohol abuse. On June 4, 2014, Carmany, (a physician's assistant, according to Alire) noted Alire's history related to the assault, and that Alire reported being stressed and "scared to return to work." Carmany referred Alire to an "individual counselor, R. Becher, LPCC." A June 19 record by Robert Becher, LPCC, indicates this was the first time Alire was being seen, and that "[i]n reviewing the records, provider concurs with PTSD diagnosis." On June 24, Alire was seen by Carmany again; that record indicates that Alire "has been free of alcohol for at least 70 days" and "[h]e denies alcohol cravings." Carmany notes that Alire "is still worried and moderately anxious, particularly about 'those guys' who assaulted him."

On July 2, 2014, Dr. Chan's records show that Alire had been to Behavioral Health, and that medications were helping Alire sleep and feel better. However, the record says that Alire "still has nightmares and dizziness due to the side effects of medication." The record also reflects that Alire still had headaches and was not yet able to work. A July 7 record shows Alire reporting to Becher that he "[h]as been feeling good up until today," and that he is less irritable and not as depressed as he was. Becher's assessment was that Alire had decreased anxiety and decreased depression, and he "[s]eems to be functioning better the longer he goes without alcohol (improved relationships, less irritability, and less reactivity)." On August 4, Becher indicated that Alire "seems less anxious," and took the "PTSD Checklist." Becher noted that Alire's anxiety "seems more related to his anxious self talk about his safety and not so much about the incident."

According to Alire's testimony, in mid-to-late August 2014, he was trimming a branch for his father-in-law and lost his balance and fell a short distance, landing on his buttocks and wrist. When Alire met with Becher on September 23, Becher noted that Alire had fallen off a ladder and injured his arm and back and had back surgery. Becher noted that Alire was "[d]issapointed about the accident as he was preparing to go back to work." Becher also noted that, since the fall, Alire continued to think about his safety since the original work incident and that he was feeling more depressed since the fall. Becher assessed Alire with "increased depression given his recent accident, increased pain, and increased dependency on others."

A November 10, 2014, report by Carmany indicates that Alire "states he is feeling better both physically and psychologically and he is hoping he can return to work soon. His mood is better overall." His left wrist is better and he "has fewer muscle spasms in his back since his fall." Carmany notes that Alire "is considering applying for disability." Carmany observed that "[Alire] appears to be overly focused on whether or not he has PTSD although he does not meet the full criteria for this disorder. He seems to want the diagnosis in order to justify obtaining Medical Cannabis." Carmany now identifies Alire's diagnoses as: acute stress disorder ("resolving, r/o PTSD"), alcohol abuse, in remission, cocaine abuse in remission, partner relationship problems.

In a medical record also dated November 10, 2014, Becher states: "[p]rovider reviewed Peter Carmany's note earlier today. Findings indicate patient meets criteria for Acute Stress Disorder." Becher's assessment indicates, "No current evidence of PTSD. R/o PTSD. Anxiety may be more related to Generalized Anxiety Disorder." Becher also noted that Alire "[s]eems to have some inconsistency about returning to work. It ranges from starting his own business to returning to work to applying for disability." However, on December 5, Becher noted that Alire was still having nightmares about the work incident and assessed that Alire "continues to exhibit symptoms related to a traumatic stress disorder."

Alire testified that in February 2015, while he was waiting for a bus, two men approached him from behind, threw him to the ground, and attempted to take his wallet. The individuals "took off running" when the bus arrived. On February 5, Becher wrote that Alire reported being assaulted by strangers at a bus stop two nights ago, and that Alire "[w]as doing better, but he still had a lot of anxiety; assault increased his paranoia and hypervigilance." Becher also noted that Alire "appeared to be improving prior to assault where he was more active and less depressed. He continues to experience anxiety which appears to have been exacerbated after the assault."

Alire continued therapy over the next several months. According to provider notes, he displayed symptoms of anxiety and depression. He also mentioned fears of returning to work and running into the men (the brothers) who assaulted him. On June 4, 2015, Becher noted that "[a]nxiety is a recurring problem," and Alire was "[m]ore depressed and anxious about his son."

HDR referred Alire to Dr. Rex Jung, a licensed clinical psychologist in Albuquerque and a professor at the University of New Mexico Department of Neurosurgery & Psychology. Dr. Jung examined Alire on July 8, 2015, and in a July 22 "Independent Neuropsychological Evaluation," he concluded that four factors complicated Alire's diagnoses:

> 1) Diagnoses of Alcohol Use Disorder and Bipolar Disorder that predate the injury. 2) A tendency to over-report symptom severity, evident at the first medical encounter (e.g. 10+/10 pain) through the current evaluation. 3) Various diagnoses including PTSD, Acute

Anxiety Disorder, Major Depressive Disorder, by various medical personnel, attempting to capture the patient's clinical presentation. 4) Incomplete and unsuccessful treatment using various pharmacological and psychotherapeutic modalities.

Dr. Jung opined that the previous PTSD diagnoses were incorrect, noting that they were based on questionnaires, that Alire tended to over report symptom severity, and that it was unclear whether portions of his symptoms predated the incident. Despite disagreeing with the PTSD diagnoses, Dr. Jung did not provide an alternative diagnosis in his July 8 report. He did conclude that Alire did not require any permanent physical restrictions for work and disagreed that Alire was unable to return to work.

Dr. Jung was deposed on November 2, 2015. During the deposition, counsel for HDR asked Dr. Jung to diagnose Alire:

Q: Okay. And if you - if you - I guess you had offered, so what would be your diagnosis of Mr. Alire?

A: I would lean towards diagnoses of, you know, acute anxiety disorder that were made previously or major depressive disorders.

Q: Okay. And those predated the accident?

A: Those both predated the accident and could have been exacerbated by the accident, certainly.

Dr. Jung also reiterated his opinion that Alire did not suffer from PTSD after the Wolf Creek incident.

Alire began treatment with Dr. Christopher Manetta, a psychologist, in August 2015. Dr. Manetta's medical record for November 3 states that Alire reported "'feeling better.'" In a "Workers Compensation Medical Questionnaire (Mental)" document dated December 9, Dr. Manetta diagnosed Alire with "Major Depressive Disorder with Acute or Chronic Depressed Mood Unspecified Anxiety Disorder--likely multifactorial in nature to include previous assault and intermitted drinking behavior, alcohol dependence--with continuous episodic drinking." Dr. Manetta found it more likely than not that the injuries Alire suffered in the December 13, 2013, incident "exacerbated his psychopathology and diminished his emotional capacity to fully participate in activities of daily living." Dr. Manetta concluded that Alire was likely to experience symptoms that would interfere with his ability to work 6 to 33 percent of the time, that his impairments would cause him to be absent from work more than twice a month, and that his attendance during a 5-day work week would be "inconsistent or sporadic due to his condition."

On January 12, 2016, Dr. Manetta noted that "[o]verall, [Alire] seems to be responding to treatment." In a letter dated March 11, Dr. Manetta noted his treatment of Alire since August 2015, and Alire's individual therapy with Becher. Dr. Manetta stated that Alire could reach his goal of returning to gainful employment if he continued to "adhere to [his] psychiatric treatment, abstain from alcohol, and remain[ed] engaged in therapy."

Trial occurred on April 8, 2016. Alire testified about still experiencing post-concussion headaches, the psychiatric effects of the incident, flashbacks, nightmares, and concerns about retaliation from the brothers. Alire also said that his continued inability to work caused depression

and financial distress to his family; and he expressed a desire to return to work when able. The compensation court entered an "Award" on May 19, 2016, finding that Alire was at MMI for any physical injuries, and there was no permanent disability from those injuries. However, the court found Alire was not yet at MMI for his psychological injury, and that Alire was temporarily and totally disabled from the date of his accident. The compensation court's order also addressed medical expenses, future medical care and treatment as reasonably necessary for Alire's mental injury, and credits for medical payments made by HDR on Alire's behalf; none of these determinations are challenged on appeal. HDR's timely appeal focuses on the psychological injury and the award of temporary total disability.

## ASSIGNMENTS OF ERROR

HDR assigns that the compensation court erred in (1) finding that Alire sustained a psychological injury as a result of the work event; (2) failing to find that independent intervening events broke the causal connection between the work event and Alire's psychological disability; and (3) concluding that Alire is temporarily and totally disabled.

## STANDARD OF REVIEW

A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers, (2) the judgment, order, or award was procured by fraud, (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award, or (4) the findings of fact by the compensation court do not support the order or award. Neb. Rev. Stat. § 48-185 (Cum. Supp. 2016).

In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court, a higher appellate court reviews the trial judge's findings of fact, which will not be disturbed unless clearly wrong. *Rader v. Speer Auto*, 287 Neb. 116, 841 N.W.2d 383 (2013). Regarding questions of law, an appellate court in workers' compensation cases is obligated to make its own decisions. *Id.*

## ANALYSIS

*Evidence of Psychological Injury.*

HDR first argues that there is insufficient evidence to support the trial court's conclusion that Alire suffered a psychological injury arising out of and in the course and scope of employment. It contends that Dr. Manetta lacked credibility, Alire's inconsistent psychological testing raises doubts about his psychological injury, and that Alire's "complicated pre-existing condition, the lack of a clear identifiable link, and the skeptical nature of the trial court" conclusively demonstrate that there was insufficient evidence to support a finding of psychological injury. Brief for appellant at 11.

If the record contains evidence to substantiate the factual conclusions reached by the trial judge in workers' compensation cases, an appellate court is precluded from substituting its view of the facts for that of the compensation court. *Miller v. E.M.C. Ins. Cons.*, 259 Neb. 433, 610 N.W.2d 398 (2000). In testing the sufficiency of evidence to support findings of fact made by the

compensation court after rehearing, the evidence must be considered in the light most favorable to the successful party and the successful party will have the benefit of every inference reasonably deducible from the evidence. *Id.* The law of this state has consistently recognized that the lighting up or acceleration of preexisting conditions by accident is compensable. *Riggs v. Gooch Milling & Elevator Co.*, 173 Neb. 70, 112 N.W.2d 531 (1961).

As the trier of fact, the Nebraska Workers' Compensation Court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Toombs v. Driver Mgmt. Inc.*, 248 Neb. 1016, 540 N.W.2d 592 (1995). When the record presents conflicting medical testimony, an appellate court will not substitute its judgment for that of the Workers' Compensation Court. *Leitz v. Roberts Dairy*, 237 Neb. 235, 465 N.W.2d 601 (1991).

The compensation court in the present matter stated:

> This Court has engaged in an exhaustive and painstaking review of the medical evidence submitted. At varying times [Alire] was diagnosed as suffering from psychological stressors variously described as post-traumatic stress disorder, acute anxiety disorder, major depressive disorder, alcohol use disorder and bipolar disorder. The search for clarity and the existence of a common thread flowing from the accident at issue proved to be elusive. The undersigned does not pretend to know or appreciate all of the intricacies in the human mind and, therefore, is routinely dependent upon the offerings of experts in the field.

The expert the court found most persuasive was Dr. Manetta. The court stated that Dr. Manetta did "not appear to embrace the diagnosis of post-traumatic stress disorder originally posited" by Dr. Chan, and that Dr. Jung (HDR's medical examiner) also indicated there was insufficient evidence to support that diagnosis. The court relied upon Dr. Manetta's opinion that Alire suffered from acute major depressive disorder with an unspecified disorder multifactorial in nature to include the assault at issue. The court stated, "As to causation [Dr. Manetta] indicated that the physical injuries suffered by [Alire] in his work related accident 'exacerbated his psychopathology and diminished his emotional capacity to fully participate in activities of daily living.'" The court pointed out that Dr. Jung also concluded that Alire's acute anxiety disorder "could have been exacerbated by the accident," and that while treatable, even Dr. Jung indicated that Alire's treatment "was incomplete and interrupted" several times, and that Alire "should be able to complete that and return to work." The compensation court found "the diagnoses rendered by Drs. Manetta and Jung to be persuasive," and also found Dr. Manetta's causation opinion to be convincing. The court also pointed out that while Dr. Jung's "opinion on causation would not standing alone prove sufficient under Nebraska law (he used the word 'could')[,] [Dr. Jung] did suggest at least that the accident certainly could have exacerbated the diagnosis he entertained."

HDR claims Dr. Manetta is not credible because he did not begin treating Alire until August 2015, because he was not "personally aware" of Alire's pre-incident psychological issues or the back injury and mugging, and because the record does not show that he reviewed Carmany's or Becher's treatment records. Brief for appellant at 12. However, HDR does not point to any evidence in the record to support these assertions and how, if true, they would sufficiently sever the causal connection between the work injury and Alire's ongoing treatment. As observed by the

compensation court, HDR's medical expert was not entirely contradictory of Dr. Manetta's opinions. As the court stated, "To the extent that [HDR's] expert, Dr. Jung, was presented to rebut the offering of Dr. Manetta, the opposite effect was arguably advanced. In other words, when asked to render his diagnosis it essentially mirrored the one offered by Dr. Manetta."

HDR's argument that Dr. Manetta lacks credibility was not persuasive with the compensation court, and this court will not substitute its judgment for that of the compensation court on such issues.

*Potential Independent Intervening Events.*

HDR argues that if this court agrees that Alire sustained a psychological injury from the work event, that the "weight of the evidence proves that traumatic, violent events in [Alire's] personal life aggravated his pre-existing psychological condition cutting off the chain of causation." Brief for appellant at 6. It is suggested that Alire's "serious fall from a ladder, bus stop mugging, tumultuous personal life, and coping with his son's psychological condition aggravated [Alire's] psychological issues and are the cause of his current state of mind and resulting disability." Brief for appellant at 13. HDR asserts that these independent intervening events aggravated Alire's psychological condition and therefore, his "ongoing psychological disability cannot be attributed to the alleged work event." Brief for appellant at 15.

An independent intervening cause, as the proximate cause of an injury, is, generally, a matter of defense and, as such, must be proved by the party asserting that defense. *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 408 N.W.2d 280 (1987). The mere possibility of an independent intervening cause does not relieve an employer from liability for an employee's otherwise compensable claim for workers' compensation and benefits. *Id.* A defendant asserting a break in causation by an independent intervening cause must prove the break in causation by competent medical testimony if the claimed injuries are of such a character that scientific testimony is required to prove their validity. See *id.*

The compensation court found there was "no credible evidence" presented to support a break in causation. The court pointed out that "there appear to be several life circumstances unrelated to the accident at issue which have caused [Alire] some manner or form of mental distress. For instance, [Alire] was assaulted by several individuals while waiting at a bus stop," and "this assault increased his paranoia and hypervigilance." Other instances included Alire's fall off the ladder and Alire's son's struggles with psychiatric illness and substance abuse. The compensation court stated, "To the extent [HDR] sought to characterize these various factors as independent intervening causes serving to negate their ongoing liability, the overall evidence was less than persuasive. Simply stated, the Court finds no persuasive medical opinion to suggest that any of these events or factors were such so as to break the causal connection between the accident at issue and [Alire's] ongoing disability."

HDR asserts that Alire's fall from the ladder "had a significant impact on [Alire's] mind." Brief for appellant at 14. However, HDR does not cite to a specific portion of the record to support its assertion that the fall worsened Alire's condition to the degree that it severed the causal connection between the work event and his current symptoms, nor could this court find any such evidence. We note that while Becher's records reflect the occurrence of the fall, and Alire's

disappointment about the accident because he was preparing to return to work, there is nothing to indicate that the fall severed the causal link between Alire's ongoing psychological symptoms and the work incident. Further, with regard to the assault at the bus stop, Becher's records also mention this incident, and that the "assault increased [Alire's] paranoia and hypervigilance." But again, there was no evidence to support this incident breaking the causal connection between Alire's ongoing symptoms and the work injury.

Finally, HDR points to marital issues and Alire's difficulties dealing with his son's mental health diagnosis and drug addiction as additional aggravating factors. However, HDR does not point to any specific medical evidence in the record to support that these issues broke the causal connection. An examination of therapy notes reveals a pattern of comments by Alire indicating a general concern for his son's well-being and family stresses, however, nothing in the records indicates that these concerns and life circumstances were sufficient to break the causal connection between Alire's ongoing symptoms and the work injury.

We do note that Dr. Jung's report provides the most critical analysis of Alire's condition after the fall, mugging, and his son's psychological problems. Dr. Jung wrote that Alire's recovery was hampered by these three incidents, and that "[t]hese setbacks were roughly evenly dispersed throughout the therapeutic intervention, interrupting what otherwise appeared to be gradual resolution of symptoms towards return to work." While noting the various events and concerns, Dr. Jung never opines that these "setbacks" were sufficient to sever the causal connection between Alire's current disability and the original work incident.

We find no error in the compensation court's determination that there was no persuasive medical opinion to suggest that any of these events or factors were sufficient to break the causal connection between Alire's ongoing disability and the work injury.

*Temporary and Total Disability.*

The compensation court concluded that there was no evidence to suggest that Alire had not reached MMI with regard to his physical injuries (bruising and concussion) "so as to justify an award of permanent disability benefits," and if it was Alire's "intent to argue that such was the case, the proof was lacking or otherwise unpersuasive." However, the court did conclude that Alire had not yet reached MMI from his psychological injury and remains temporarily totally disabled. HDR takes issue with this portion of the award.

HDR argues that Alire has the ability to earn wages despite any psychological disability and that there was insufficient evidence to support the compensation court's finding of temporary total disability. HDR contends that "a review of [Alire's] vocational background, testimony, and the medical opinions reveals [Alire] had the ability to earn wages despite any psychological disability." Brief for appellant at 16.

Temporary disability is the period during which the employee is submitting to treatment, is convalescing, is suffering from the injury, and is unable to work because of the accident. *Zwiener v. Becton Dickinson-East*, 285 Neb. 735, 829 N.W.2d 113 (2013). Total disability exists when an injured employee is unable to earn wages in either the same or a similar kind of work he or she was trained or accustomed to perform or in any other kind of work which a person of the employee's mentality and attainments could perform. *Id.*

Whether an injured worker is totally disabled is a question of fact to be determined by the compensation court, whose finding may be reversed on appeal only if it is clearly wrong. *Benish Kaufmann v. Control Data*, 237 Neb. 224, 465 N.W.2d 727 (1991). While expert witness testimony may be necessary to establish the cause of a claimed injury, the Workers' Compensation Court does not need to depend on expert testimony to determine the degree of disability but instead may rely on the testimony of the claimant. *Cords v. City of Lincoln*, 249 Neb. 748, 545 N.W.2d 112 (1996).

The compensation court found that Alire has been temporarily and totally disabled since the date of his accident, December 13, 2013. The court determined that "the more persuasive evidence suggests that the plaintiff has yet to reach MMI" with respect to the mental injury sustained from the work incident. The court stated:

> To be fair, Dr. Manetta did at one time offer his opinion that [Alire] ought to observe certain 'permanent work restrictions[,]" . . . but that opinion was followed three months later or on March 11, 2016[,] with an opinion that [Alire] could return to gainful employment if he continued to adhere to his psychiatric treatment and participate in therapy. By engaging in such treatments, Dr. Manetta believed that [Alire] could 'reach this goal' of returning to work.

The court also pointed out that HDR's expert "had also indicated that [Alire] ought to complete his treatment so that he could return to his prior job." The compensation court concluded that "the better evidence suggests that [Alire] remains temporarily totally disabled."

HDR cites to portions of Alire's testimony and other evidence which suggest that he might be able to work as something besides an ironworker. They mention Alire's business contractor's license, training in post tensioning, forklift operations, crane operations, CPR, first aid, and safety hazards. They suggest that Alire "has gained a wealth of knowledge and skills throughout the years which could be applied to several different jobs. [Alire] admitted he could return to the open labor market as a contractor bidding out work." Brief for appellant at 17.

Alire testified at length about symptoms arising from the incident. He described daily headaches that require him to lie down. He said he suffered from anxiety since the incident, requiring medication, and that he becomes irritable frequently, a symptom which has worsened over time. Alire did not think he could work as an ironworker because his medication had him "in a bad state of mind right now." He did not believe he would be allowed on the job while taking Adderall and Valium. He said that he is unsure if it would be safe for him to operate a forklift or flag a crane while under the influence of his current medications.

Both Drs. Manetta and Jung generally agree that Alire should complete his treatment before returning to work. In a March 11, 2016, letter, Dr. Manetta stated: "I understand it is your wish to return to gainful employment. If you continue to adhere to your psychiatric treatment, abstain from alcohol, and remain engaged in therapy, I do believe you can reach this goal." In addition, Dr. Jung seemed to agree with this assessment during his deposition:

> Q: Okay. And from a psychiatric standpoint, do you believe he could return to his prior job?

A: I do. I do not know where he is in terms of treatment of, you know, his anxiety and depression at this point. I know that he under - it looked like he was undergoing that, and again, it was interrupted at several junctures, but that, you know it - he should be able to complete that and return to work.

We again note that whether an injured worker is totally disabled is a question of fact to be determined by the compensation court, whose finding may be reversed on appeal only if it is clearly wrong. *Benish, supra*. The record supports the compensation court's conclusions that "the more persuasive evidence" shows that Alire has not reached MMI and that "the better evidence suggests that he remains temporarily totally disabled." We find no clear error in that determination.

## CONCLUSION

Finding no errors of law or fact, the May 19, 2016, award entered by the compensation court is affirmed.

AFFIRMED.