**2022 UT 31**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JBS CARRIERS and AMERICAN ZURICH INSURANCE COMPANY,
*Respondents*,

*v.*

UTAH LABOR COMMISSION and DAVID HICKEY,
*Petitioners*.

No. 20210321
Heard November 10, 2021
Filed June 30, 2022

On Certiorari to the Utah Court of Appeals

Attorneys:

Brad J. Miller, Rachel Konishi, Greenwood Village, CO, for respondents

Chris Hill, Salt Lake City, for petitioner Utah Labor Commission

Gary E. Atkin, Kenneth E. Atkin, Salt Lake City, for petitioner David Hickey

JUSTICE PETERSEN authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE PEARCE, and JUDGE WELCH joined.

ASSOCIATE CHIEF JUSTICE LEE authored a dissenting opinion.

Due to his retirement, JUSTICE HIMONAS did not participate herein; DISTRICT JUDGE TERESA L. WELCH sat.

JUSTICE HAGEN became a member of the Court on May 18, 2022, after oral argument in this matter, and accordingly did not participate.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1 David Hickey worked as a long-haul truck driver for JBS Carriers (JBS). At the end of a three-day drive from Utah to California, which included a stretch in which he drove for approximately nine hours with only one break and little

movement of his left leg, he began experiencing swelling in that leg and shortness of breath. After finishing his route, he went to a hospital in California. He was diagnosed with a blood clot in his left leg (deep vein thrombosis or DVT), which caused blood clots in his lungs (pulmonary emboli).

¶2 After his hospitalization, Hickey could not return to work as a truck driver and sought workers' compensation. He asserted that the DVT and pulmonary emboli arose from his drive to California for JBS. JBS disputed Hickey's workers' compensation claim. It argued that his injuries were actually caused by his "super obesity," a term used in medical literature "to describe a person with a BMI over 50." And JBS asserted that super obesity should be considered a preexisting condition under these circumstances.

¶3 Whether workers' compensation claimants have a relevant preexisting condition is significant because, if they do, to obtain compensation they must show not only medical causation—in other words, that the injury is "medically the result" of the employment activity, *Allen v. Indus. Comm'n*, 729 P.2d 15, 27 (Utah 1986)—but also legal causation. To show legal causation, claimants must show that the employment activity "contributed something substantial to increase the risk [they] already faced in everyday life" due to their preexisting condition. *Id.* at 25. We have said that to make such a showing, a workers' compensation claimant must demonstrate that the employment activity that precipitated the injury was "unusual or extraordinary" when compared to normal life activities. *Murray v. Utah Lab. Comm'n*, 2013 UT 38, ¶ 48, 308 P.3d 461.

¶4 Here, we are asked to determine whether Hickey's long drive in a commercial truck is an unusual or extraordinary activity in comparison to the ordinary activities people perform in their everyday, nonwork lives. We conclude that it is unusual. And because Hickey has therefore shown that his employment activity was the legal cause of his DVT and pulmonary emboli, we need not address whether super obesity is a preexisting condition, since he is able to show legal causation even if it was.

¶5 Accordingly, we reverse the court of appeals' holding that Hickey's long-haul truck drive was similar to typical, everyday activities. Further, we vacate the court's conclusion that there was substantial evidence in support of the administrative law judge's (ALJ's) finding that Hickey's "super obesity" was a preexisting condition because it is unnecessary to the resolution of

Hickey's claim. And we reinstate the decision of the Labor Commission Appeals Board.

## BACKGROUND

¶6    Hickey worked for JBS as a long-haul truck driver. Over the course of three days, Hickey drove a route for JBS that began in Tremonton, Utah, and ended in Madera, California. Starting late on the second day, Hickey drove for six hours and twenty-five minutes straight, followed by another two hours and twenty-five minutes without stopping. He drove an automatic transmission truck that did not require the use of his left leg, so he rarely moved that leg while driving the truck. And it was his general practice to remain in the driver's seat when he stopped for loading and unloading, so he likely spent more time in the truck than his driving logs indicated.

¶7    After arriving at Madera on the third and final day of the trip, Hickey began experiencing swelling in his left leg and shortness of breath. He went to a local hospital where he was admitted for treatment. He was released after three days, but was admitted to another hospital ten days later. Hickey was diagnosed with DVT and pulmonary emboli. He was hospitalized for a total of sixteen days. And when he was finally released, he was unable to return to work and applied for workers' compensation.

¶8    In his workers' compensation claim, Hickey argued that the DVT and pulmonary emboli arose from his employment with JBS as a long-haul truck driver. Specifically, he claimed that the blood clots were caused by the second day of his trip, when he drove for almost nine hours with only one break and without moving his left leg.

¶9    JBS disputed Hickey's workers' compensation claim, arguing that his injuries were merely the result of a preexisting condition—super obesity—and not his employment. The dispute went before an ALJ, who appointed a medical panel and ultimately determined that Hickey had failed to show legal causation—in other words, that his employment contributed something substantial to increase his risk of injury.

¶10 The ALJ found that Hickey's super obesity was a preexisting condition, so he applied the test we adopted in *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986), to determine whether Hickey's employment was the legal cause of his injuries. The *Allen* test is used to distinguish between injuries resulting from a preexisting condition that only coincidentally occur while

an individual is working and injuries that were precipitated by an employment activity that increased the risk of injury normally faced by the worker in nonwork life. *Id.* at 25. To make this distinction, we have instructed the agency or court to: (1) consider the totality of the circumstances to determine what workplace activity precipitated the injury; and (2) determine whether that activity was objectively unusual or extraordinary when compared to normal life activities. *Murray v. Utah Lab. Comm'n*, 2013 UT 38, ¶ 48, 308 P.3d 461.

¶11 After considering the totality of the circumstances surrounding Hickey's drive to California, the ALJ concluded that it was not an unusual or extraordinary activity under part two of the *Allen* test. Because the ALJ denied Hickey's claim based on lack of legal causation, he never reached the question of medical causation and did not calculate Hickey's medical expenses or disability compensation.

¶12 Hickey appealed the decision to the Labor Commission Appeals Board (Board), arguing that the medical panel had not been qualified to assess his injuries, that the ALJ erred in his causation analysis by looking for the greatest risk factor leading to Hickey's injuries rather than whether Hickey's employment activity increased the risk of his injuries, and that super obesity was not a preexisting condition.

¶13 The Board resolved Hickey's claim by determining that he had satisfied the *Allen* test. It concluded that Hickey's long-haul truck drive was an unusual activity when compared to nonwork life. And for this reason, the Board did not reach the question of whether Hickey's super obesity was a preexisting condition, because even assuming it was, he was able to show that the employment activity was the legal cause of his injury.

¶14 The Board remanded the case back to the ALJ "to complete the adjudication of Mr. Hickey's claim." The ALJ restated his previous conclusion that Hickey's super obesity was a preexisting condition and adopted the Board's holding that Hickey had satisfied the *Allen* test for legal causation. The ALJ also determined that Hickey's injuries were medically caused by his work as a commercial truck driver and accordingly awarded Hickey workers' compensation benefits.

¶15 JBS then appealed the ALJ's decision to the Board, arguing among other things that the ALJ had misapplied the *Allen* standard of "unusual or extraordinary" activity. The Board affirmed the ALJ, and again found it unnecessary to determine

whether Hickey had a preexisting condition because even if he did, he had shown legal causation. JBS then appealed to the court of appeals.

¶16 The court of appeals reversed the Board, agreeing with JBS that Hickey's work activities were not unusual or extraordinary under *Allen*. *JBS Carriers v. Lab. Comm'n*, 2021 UT App 44, ¶ 25, 489 P.3d 221. The court of appeals discounted some of the employment circumstances considered by the Board because they had not been "required" by the employment, noting that the Board had not found that Hickey was *prevented* from taking breaks and that "no requirement of the job prevented Hickey from stretching his inactive left leg while operating the truck with his other limbs." *Id.* ¶ 23. And the court "perceive[d] no meaningful distinction between sitting for a long time in a truck cab and sitting for a long time in a passenger car, or sitting for a long time in an airplane seat, or even sitting for a long time on a couch in front of a television screen"—activities the court considered neither "unusual [n]or extraordinary." *Id.* ¶ 24.

¶17 Because the court of appeals determined Hickey could not show his "required" employment activities were the legal cause of his injuries under *Allen*, it remanded the case to the Board to determine in the first instance if Hickey's super obesity was a preexisting condition. *Id.* ¶ 28. But despite acknowledging that the court of appeals "do[es] not directly review the decisions of an ALJ," the court opined that there was substantial evidence to support the ALJ's finding that Hickey had a preexisting condition. *Id.* ¶¶ 28, 30, 32–33.

¶18 Hickey petitioned for certiorari, which we granted. We are asked to decide whether the court of appeals erred in (1) reversing the Board's determination that Hickey's long-haul commercial truck drive was an unusual or extraordinary activity under the *Allen* test; and (2) advising that there was substantial evidence to support the ALJ's finding that Hickey's super obesity was a preexisting condition, when the Board had not yet addressed that question.

¶19 We exercise jurisdiction under Utah Code section 78A-3-102(3)(a).

**STANDARD OF REVIEW**

¶20 "On certiorari, we review the decision of the court of appeals for correctness, giving no deference to its conclusions of law." *State v. Richins*, 2021 UT 50, ¶ 39, 496 P.3d 158 (citation

omitted). "And '[t]he correctness of the court of appeals' decision turns, in part, on whether it accurately reviewed the [agency's] decision under the appropriate standard of review.'" *Murray v. Utah Lab. Comm'n*, 2013 UT 38, ¶ 7, 308 P.3d 461 (alterations in original) (citation omitted).

## ANALYSIS

¶21 We first address Hickey's claim that the court of appeals erred when it determined he had not shown legal causation. The court's conclusion was based on its determination that Hickey's long-haul drive was not an unusual or extraordinary activity under *Allen*. But we agree with Hickey that driving a commercial truck for approximately nine hours in one day with only one break, with a motionless left leg, is not equivalent to ordinary, everyday nonwork activities.

¶22 Since we conclude that Hickey's employment activities were the legal cause of his injuries—in other words, that Hickey's extended truck drive increased the risk of these injuries—we need not determine whether Hickey's super obesity was a preexisting condition or whether the court of appeals erred in addressing the ALJ's findings on this issue. And we vacate the court of appeals' analysis on this point.

## I. LEGAL CAUSATION

¶23 Assuming for the sake of argument that Hickey's super obesity was a preexisting condition here, the core of the dispute before us is legal causation: Did Hickey's long drive to California increase the risk that he would suffer DVT and pulmonary emboli? Or would his injuries have happened in any event because of his super obesity, and it was only coincidental that the DVT and pulmonary emboli manifested at the end of his drive?

¶24 The Workers' Compensation Act provides compensation to "[a]n employee . . . who is injured by accident arising out . . . of and in the course of the employee's employment, wherever such injury occurred, if the accident was not purposely self-inflicted." UTAH CODE § 34A-2-401(1). We have interpreted the language "arising out of and in the course of the employee's employment" as "requir[ing] proof of a causal connection between the injury and the worker's employment duties." *Allen v. Indus. Comm'n*, 729 P.2d 15, 22, 24–25 (Utah 1986) (citation omitted).

¶25 It becomes more difficult to determine whether an injury "ar[ose] out of and in the course of the employee's employment"

when the employee has a preexisting condition. We addressed this challenge in *Allen*, explaining that,

> The causation requirement makes it necessary to distinguish those injuries which (a) coincidentally occur at work because a preexisting condition results in symptoms which appear during work hours without any enhancement from the workplace, and (b) those injuries which occur because some condition or exertion required by the employment increases the risk of injury which the worker normally faces in his everyday life.

*Id.* at 25.

¶26 To help determine causation when a claimant has a preexisting condition, we adopted a test from Arthur Larson's treatise, *The Law of Workmen's Compensation*. *Id.* at 25–27 (citing ARTHUR LARSON, THE LAW OF WORKMEN'S COMPENSATION § 38.83(b), at 7–278 (1986)). "Under that test, a claimant must establish that the conditions or activities of his job were both the medical cause and the legal cause of his injury." *Murray v. Utah Lab. Comm'n*, 2013 UT 38, ¶ 45, 308 P.3d 461. To establish medical causation, a claimant must show "there is a medically demonstrable causal link between the work-related exertions and the unexpected injuries that resulted from those strains." *Allen*, 729 P.2d at 27. If a claimant has no relevant preexisting condition, the claimant need show only medical causation. *See id.* at 26. But a claimant with a relevant preexisting condition must also show "that the employment contributed something substantial to increase the risk he already faced in everyday life because of his condition." *Id.* at 25.

¶27 There is no dispute that Hickey has demonstrated medical causation, so only legal causation is at issue here. In *Murray v. Utah Labor Commission*, we further distilled the legal causation test from *Allen*: the first step is to "characterize the employment-related activity that precipitated the employee['s] injury, taking into account the totality of the circumstances." 2013 UT 38, ¶ 48. This is a question of fact, *id.* ¶ 49, which we review for substantial evidence, *see* UTAH CODE § 63G-4-403(4)(g). The second step is to "determine whether this activity is objectively unusual or extraordinary" when compared with typical, nonemployment life. *Murray*, 2013 UT 38, ¶ 48. "This . . . determination is a mixed question of law and fact," *Price River Coal Co. v. Indus. Comm'n of Utah*, 731 P.2d 1079, 1082 (Utah 1986),

because it requires the agency to apply "a legal standard to a set of facts unique to a particular case," *Murray*, 2013 UT 38, ¶ 24 (citation omitted). But "the question of whether a set of facts falls within a legal standard is itself a question of law," *id.* ¶ 33, so we do not defer to the Board's legal determination of whether an employment activity was unusual or extraordinary, *see id.* ¶ 40.

### A. Step One: Totality of the Circumstances

¶28 Under the initial *Allen* inquiry, the "agency must determine as a matter of fact exactly what were the employment-related activities of the injured employee." *Price River Coal Co.*, 731 P.2d at 1082. In other words, "in determining whether the employment activity that precipitated [Hickey's] injury was 'unusual' under *Allen*, we must consider the totality of the circumstances." *See Murray*, 2013 UT 38, ¶ 47.

¶29 The court of appeals noted that the facts of Hickey's employment activity prior to his injuries were not in dispute:

> The [Board] described the relevant portion of Hickey's employment activity as "driving for more than six hours without a break and then driving for almost two and a half hours more later in the same day." Additionally, the [Board] noted that Hickey's truck "had an automatic transmission that did not require use of his left leg to engage the truck's pedals," and noted that Hickey "would usually remain in the driver's seat as his truck was being loaded and unloaded," which meant "that his driving time alone did not fully account for the time he spent sitting in the truck."

*JBS Carriers v. Lab. Comm'n*, 2021 UT App 44, ¶ 19, 489 P.3d 221.

¶30 However, the court of appeals discounted some of the Board's factual findings and inferences because they related to activity that was not specifically "required" by JBS. In particular, the court disregarded the Board's finding that Hickey had not moved his left leg while driving because "Hickey offered no evidence that his employment duties *required* him to keep his leg motionless while driving." *Id.* (emphasis added). And the court discounted the Board's finding that Hickey had spent more time sitting in his truck than his driving logs indicated because "no party offered any evidence that Hickey's employment duties *required* him to drive for any particular length of time before taking a break." *Id.* (emphasis added).

¶31 The court's focus on whether the *manner* in which Hickey conducted his employment activities was *required* by JBS was based on its interpretation of language from *Allen*. As quoted above, we stated in *Allen* that the legal causation test helps to identify "those injuries which occur because some condition or exertion *required by the employment* increases the risk of injury which the worker normally faces in his everyday life." 729 P.2d at 25 (emphasis added).

¶32 But we did not intend for this phrase to narrow the circumstances relevant to legal causation to only those actions specifically required by the employer. Generally, the term "required" means "stipulated as necessary to be done, made, or provided." *Required*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/required (last visited June 14, 2022). "Required" can be used in common parlance at both a general and specific level—for example, Hickey's employment "required" him to drive to California, although it may not have specifically "required" him to drive without moving his leg or to stay in his truck during stops for loading and unloading.

¶33 We clarify that in *Allen*, we were using the phrase "required by the employment" at a general level. A "condition or exertion required by the employment" refers generally to conditions, exertions, or activities that are employment-related as opposed to those activities that are not associated with work. This language does not mean that to be relevant to the *Allen* totality-of-the-circumstances inquiry, the specific manner in which the claimant performed the work activity had to be required by the employer. For example, in *Allen*, we described the claimant's relevant workplace activity as "moving and lifting several piles of dairy products weighing thirty to fifty pounds in the confined area of the cooler." 729 P.2d at 28. We remanded for additional fact-finding to determine "how many crates were moved by the claimant, the distance the crates were moved, the precise weight of the crates, and the size of the area in which the lifting and moving took place." *Id.* Notably, we did not ask if the employer required the claimant to lift a certain number of crates at a time or use a certain technique. This is because the relevant "totality of the circumstances" includes all work-related activity that precipitated the injury. The limiting factor is whether the activity was related to the claimant's employment, not whether the employer required the claimant to perform the work in the specific manner that caused the injury.

¶34 The totality-of-the-circumstances analysis in *Murray* also demonstrates this point. In that case, a park ranger stumbled on a boat while on patrol, and we described the workplace activity by referring to the position in which he was standing, what he was holding, what he was wearing, and the manner in which he fell. 2013 UT 38, ¶¶ 49–50. We did not address whether he had been required to stand in a certain way, or to balance himself in such a manner. The required employment activity was the act of engaging in boat patrol—not the exact manner in which the claimant did so. *Id.*

¶35 To read "required by the employment" granularly causes the *Allen* framework to diverge from the language of the Workers' Compensation Act. The Act "represents a compromise between employee and employer." *Gudmundson v. Del Ozone*, 2010 UT 33, ¶ 28, 232 P.3d 1059. Under this compromise, "workers give up their right to sue their employers in tort for workplace injuries. In return, workers are granted the right to statutory remedies that are afforded without regard to proof of fault." *Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 89, 361 P.3d 63 (Lee, A.C.J., dissenting). This bargain allows workers to recover workers' compensation, even if they were negligent or at fault in some way, so long as "the accident was not purposely self-inflicted." UTAH CODE § 34A-2-401(1). The Workers' Compensation Act even allows employees to receive workers' compensation "when injury is caused by the willful failure of the employee" to obey reasonable safety rules, but with a fifteen percent deduction from the award. *Id.* § 34A-2-302(3)(a).

¶36 Overly narrowing the relevant employment activities results in a distortion of this hallmark of the Workers' Compensation Act. The court of appeals noted that Hickey "presented no evidence that the delivery requirements of the trip in question made it impractical to take breaks" and that "no requirement of the job prevented Hickey from stretching his inactive left leg while operating the truck with his other limbs." *JBS Carriers*, 2021 UT App 44, ¶ 23. By analyzing whether Hickey was required to complete his work as he did, the court introduced an element of comparative fault that the workers' compensation framework was designed to avoid. The facts relevant to a workers' compensation claim include all of the work-related activities that precipitated the worker's injuries—not what they could or should have been.

¶37 The totality of the circumstances found by the Board were that Hickey drove a route from Utah to California over the course of three days, which involved a particular stretch in which he drove for almost six-and-a-half hours straight followed by another two-and-a-half-hour drive. He was stationary during this time, and in particular did not move his left leg because the truck had an automatic transmission. Further, Hickey provided evidence that as a general practice, he remained seated in his truck during stops for loading and unloading. The Board inferred from this that Hickey had likely followed this same practice during his drive to California, and therefore "his driving time alone did not fully account for the time he spent sitting in the truck." *Id.* ¶ 19. All of these facts are included in the "totality of the circumstances" relevant to the *Allen* analysis. At a general level, Hickey was required to drive to California for work. It does not matter whether JBS specifically required him to drive for an extended period of time without breaks or to keep his left leg still.

### B. Step Two: Unusual or Extraordinary Activity

¶38 Having identified the totality of the circumstances surrounding the employment activity that precipitated Hickey's injuries, we turn to the court of appeals' determination that this activity was not unusual under step two of the *Allen* test. We disagree with the court of appeals and conclude that Hickey's long-haul drive in a commercial diesel truck is distinct from typical nonemployment activities in everyday life.

¶39 Under step two of the *Allen* test, we must "compare the activity that precipitated the employee's injury with 'the usual wear and tear and exertions of nonemployment life.'" *Murray*, 2013 UT 38, ¶ 48 (quoting *Allen*, 729 P.2d at 26). We apply an objective standard, based on activities "the average person typically undertakes in nonemployment life," *Allen*, 729 P.2d at 28, rather than looking to "the nonemployment life of the particular worker," *id.* at 26. An activity is unusual under the test if the exertion it requires or its impact on the body is different from the "typical nonemployment activities . . . generally expected of people in today's society." *Id.* Examples of employment activities that Utah courts have considered unusual and extraordinary include those that involve "jumping, lifting great weight, or repetition." *Murray*, 2013 UT 38, ¶ 51. In contrast, the *Allen* court named examples of typical exertions performed in ordinary life, including taking a trash can out to the curb and "climbing the stairs in buildings." 729 P.2d at 26.

¶40 Applying this objective standard, the court of appeals concluded that Hickey's drive was neither unusual nor extraordinary because the court "perceive[d] no meaningful distinction between sitting for a long time in a truck cab and sitting for a long time in a passenger car, or sitting for a long time in an airplane seat, or even sitting for a long time on a couch in front of a television screen." *JBS Carriers*, 2021 UT App 44, ¶ 24. We must disagree for two reasons.

¶41 First, the *Allen* analysis requires a comparison of the workplace activity with nonwork activity that is typical of everyday life. The question is not whether some corollary can be identified in nonwork life that some people may do occasionally, but whether the employment activity is like the usual and ordinary activities that people do in everyday life. Unlike taking out the trash or climbing stairs, driving a commercial truck for nine hours in one day with only one break—and with a stationary left leg—is not typical of everyday nonwork life. And while some people may watch television for nine hours straight without moving, take nine-hour international flights and leave their seat only once, or go on long road trips, we cannot describe these as typical of the usual, ordinary activities people do day to day.

¶42 Fundamentally, if we define usual nonemployment activities so broadly as to include international flights and binge-watching television, we may distort the *Allen* test so that virtually any work activity has some equivalent in nonemployment life. For example, we have concluded that "jumping, lifting great weight, [and] repetition," *Murray*, 2013 UT 38, ¶ 51, are unusual workplace activities. But *some* people may *sometimes* do those things in nonwork life. After all, some people jump out of airplanes with parachutes, lift 200 pounds at the gym, or run marathons. But the fact that some people sometimes do these things does not make them typical of everyday life. In analyzing whether a particular workplace activity is "unusual" or "extraordinary," the benchmark for usualness or ordinariness is activity that is *typical* of *everyday* nonwork life—like taking out a trash can, walking up stairs, *Allen*, 729 P.2d at 26, or regaining one's balance during a bumpy bus ride, *Murray*, 2013 UT 38, ¶ 53.

¶43 Second, the nonemployment activities referenced by the court of appeals differ from professional long-haul truck driving in some key respects. Hickey was not just sitting passively for nine hours. He was responsible for operating a commercial 18-wheel diesel truck on the highway from Utah to California. So he

had to remain focused on the road, seated in the driver's seat, and in a relatively stationary position with his head forward and arms on the steering wheel. His left leg was motionless, and in general he had "very little" room to move his feet. He had "limited opportunity . . . to stretch, change position, or otherwise move about." And the Board emphasized that "driving a truck is more complex and demanding than operating or traveling in a personal automobile." If Hickey's job was more taxing than driving a personal car, it was certainly more demanding than sitting on a sofa watching television or sitting on an airplane as a passenger.

¶44 But while we ultimately disagree with the court of appeals' determination that Hickey's drive to California was not an unusual activity under *Allen*, we recognize the challenge the Labor Commission and courts face when asked to assess whether an employment activity is typical, usual, or ordinary. The varying conclusions of the ALJ, the Board, the court of appeals, and now our court on this question demonstrate this difficulty. Perceptions of what is "usual" or "unusual" can vary. And we do not dispute the dissent's observation that there is no precise metric for determining what is typical or usual. *Infra* ¶¶ 52–53.

¶45 It is possible that, as the dissent posits, there is a better way to determine whether a claimant's injury arose "out of and in the course of the employee's employment," UTAH CODE § 34A-2-401(1), when the claimant has a preexisting condition. But neither party has asked us to overturn *Allen* or briefed the *Eldridge* factors for overturning precedent. *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553 (identifying "(1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down" as two factors to consider before overturning precedent). And we have no briefing before us on the merits of an alternative to the *Allen* test. So while the dissent makes some valid points, "[w]e do not overrule our precedents 'lightly.'" *Taylorsville City v. Mitchell*, 2020 UT 26, ¶ 30, 466 P.3d 148 (quoting *Eldridge*, 2015 UT 21, ¶ 21). And we generally do not return to the drawing board "unless and until a party meets its burden of establishing that our prior case law is unworthy of stare decisis respect." *Waite v. Utah Lab. Comm'n*, 2017 UT 86, ¶ 88, 416 P.3d 635 (Pearce, J., concurring).

¶46 To provide additional guidance in this area within the confines of our precedent, we emphasize that the question is not whether some corollary to the employment activity can be located

that some people may do outside of work. The question is whether the employment activity is comparable to the usual and ordinary activities that are typical of everyday nonwork life.

¶47 Because we have determined that driving a commercial diesel truck for approximately nine hours with only one break and a stationary left leg is not like the ordinary activities people do in everyday life, we reverse the court of appeals' decision. Hickey has successfully shown his employment activities were the legal cause of his injuries under *Allen*. Accordingly, he has prevailed on his workers' compensation claim, regardless of whether his super obesity was a preexisting condition.

¶48 For this reason, we need not determine whether Hickey's super obesity functioned as a preexisting condition here. And we do not address whether the court of appeals erred in opining on this question, which was addressed by the ALJ but not the Board. Accordingly, we vacate this portion of the court of appeals' opinion.

## CONCLUSION

¶49 When a workers' compensation claimant has a preexisting condition, the claimant must show that the employment activity that precipitated the injury was the medical cause and the legal cause of those injuries. To determine legal causation, the initial step is to consider the totality of the employment-related circumstances that precipitated the injury—without regard to whether the manner in which the claimant conducted the work was specifically required by the employer. The next step is to determine whether the employment activity is unusual or extraordinary when compared with the typical, ordinary activities that people do in everyday, nonwork life. Because we conclude that Hickey's drive to California was an unusual activity, he has shown legal causation. We therefore reverse the court of appeals' opinion and reinstate the decision of the Board.

―――――――――

Associate Chief Justice Lee, dissenting:

¶50 Our case law holds that a workers' compensation claimant who has a preexisting condition must show that his "employment contributed something substantial to increase the risk he already faced in everyday life because of his condition." *Allen v. Indus. Comm'n*, 729 P.2d 15, 25 (Utah 1986). This is our standard of legal causation. It requires (1) an identification of "the

employment-related activity that precipitated the employee['s] injury," and (2) a determination as to "whether this activity is objectively unusual or extraordinary" compared to a baseline of what is "typical" or "usual" in nonemployment life. *Murray v. Utah Lab. Comm'n*, 2013 UT 38, ¶ 48, 308 P.3d 461 (citations omitted); *see also Allen*, 729 P.2d at 26 (speaking of "typical nonemployment activities . . . generally expected of people in today's society"); *id.* at 28 (stating that the claimant must show that his exertion "exceeded [what] the average person typically undertakes in nonemployment life").

¶51 The baseline is framed in purportedly objective terms. It is defined not by an individual worker's subjective activity in his actual "nonemployment life" but by what is "typical," "usual," or "generally expected" of "average" people "in today's society." *Id.* at 26, 28. But these seemingly objective terms lack clear meaning in our case law. And unless and until we fill in the missing substance we won't really have an objective standard. We will have a test that carries an air of objectivity but leaves case-by-case disposition up to the subjective inclinations of individual factfinders. *See supra* ¶ 44 (acknowledging that the court has not established a "precise metric for determining what is typical or usual" and conceding that this creates a "challenge"—opening the door to "[t]he varying conclusions of the ALJ, the Board, the court of appeals, and now our court" in this case).

¶52 The closest we have come to giving content to the standard is in the lists set forth in our cases—of nonemployment activities we deem to fall either within or beyond the bounds of what is typical. *Allen* says that "typical" nonemployment activities include "climbing the stairs in buildings" and taking a trash can out to the curb. 729 P.2d at 26. And *Murray* states that "jumping," "lifting great weight," and "repetition" of such activity are atypical. 2013 UT 38, ¶ 51. But our cases identify no predicate for our formulation of these lists, and they provide no guidance as to how the lists might be extended in future cases. And we have sidestepped the devil that is lurking in the details of our lists.

¶53 A key point of imprecision is in the lack of a standard for judging typicality or usualness. How is the average person defined? How many members of the general public must engage in a given activity for it to count as typical? How frequently must they engage in it for it to qualify as usual? And how is a factfinder supposed to judge whether a given activity satisfies the standard—to measure the extent or frequency of a given activity?

We have nowhere acknowledged the difficulty posed by these unanswered questions. And we have come nowhere close to answering them.

¶54 The *Allen* lists are worse than opaque. They are also misleading. We have never identified the degree of stair-climbing or trash-can-carrying that is typical or usual. And a given job could easily require more stair-climbing or trash-can-carrying (or similar acts) than most people engage in with any regularity. A parallel problem appears in our lists of supposedly unusual activities. Surely there are a lot of people who engage in a degree of jumping and heavy lifting in their day-to-day nonemployment activities. For these reasons, the seemingly objective lists set forth in *Allen* and *Murray* are not only not objective; they do not align with the theory of our law of legal causation.[1]

¶55 All of these problems are on display in the case before us here. The majority seeks to address them in its response to the court of appeals' extension of our lists in *Allen* and *Murray*—the court of appeals' addition of "sitting for a long time in an airplane seat" and "sitting for a long time on a couch in front of a television screen." *See supra* ¶ 16. But the majority's response to the additions to our lists kicks the can down the road on the above-noted points of imprecision.

¶56 The majority suggests that the court of appeals' additions to our lists are problematic because they do not describe acts that are "typical of the usual, ordinary activities people do day-to-day." *Supra* ¶ 41. And the majority attempts to address some points of imprecision in our case law by "emphasiz[ing]" that "the

---

[1] These concerns are not entirely new. Some of them were raised decades ago by Associate Chief Justice Stewart. *See Allen v. Indus. Comm'n*, 729 P.2d 15, 30 (Utah 1986) (Stewart, A.C.J., dissenting) (stating that the dissent was "unable to understand how an administrative law judge, the [Labor] Commission, or an appellate court is supposed to determine what 'typical nonemployment activities' are 'in today's society'"; questioning whether the standard "mean[s] what a typical sixty-five-year-old does or a typical twenty-one-year-old?"; objecting to the formulation of lists of activities that "reflect only what some people may do from time to time" "[i]nstead of defining a meaningful standard"; and concluding that our law "has not set forth a workable standard").

question is not" what "some people may do occasionally" "outside of work." *Supra* ¶¶ 41, 46. But the court nowhere identifies a standard or quantum of typicality or usualness, or a basis for concluding that carrying a trash can to the curb is a "typical" "day-to-day" event for an "average" person but tv binge-watching is not.

¶57 Today's majority begs all the same questions that *Allen* did—as to how the "average" person is to be defined; how many members of the general public must engage in an activity for it to count as "typical"; how frequently they must engage in it for it to qualify as "day-to-day," "everyday," or "usual";[2] and how the factfinder is supposed to measure the commonality or frequency of these sorts of events. (My sample size is admittedly small, but the members of my household seem to engage in more binge-watching than trash-can-carrying.)

¶58 I respectfully dissent from the extension of an "objective" standard that lacks these (and other important) hallmarks of objectivity. And I see no way to reframe *Allen* in terms that are both truly objective and practically workable.

¶59 A truly objective inquiry may ultimately prove unattainable in this context, at least in the broad run of cases.[3] I

---

[2] The majority refers both to "day-to-day" activities and uses the *Allen* language of "everyday" activities. *Supra* ¶¶ 38, 41–42, 46; *Allen*, 729 P.2d at 25 (asking whether "the employment contributed something substantial to increase the risk" that a worker "already faced in everyday life because of his condition"); *see also Murray v. Utah Lab. Comm'n*, 2013 UT 38, ¶ 53, 308 P.3d 461 (holding that the claimant's exertion was not more than "generally expected . . . in everyday life").

[3] *See Duvall v. Charles Connell Roofing*, 564 A.2d 1132, 1135–37 (Del. 1989) (rejecting the objective standard proposed in the Larson treatise on workers' compensation on the ground that "this rule . . . raises several immediate problems," including: "Who is the average person in 'normal' non-employment life[,] [and] how is the comparable level of activity in 'normal' non-employment life to be determined, and by whom? How does one compare the level of exertion in moving or lifting heavy objects on the job versus strenuous, but 'normal' non-employment activities?").

see no ready model for refining the objective standard. The case law in the minority of states that have adopted a "typical nonemployment activities" standard suffers from the same deficiencies found in our law.[4] And even the treatise that formulated the objective standard relies on lists of activities—without any basis for connecting the list to an objective, workable standard. LARSON'S WORKERS' COMPENSATION LAW § 46.03; *id.* § 46.03[2] (asserting that "the usual wear and tear of life . . . certainly includes lifting objects weighing 20 pounds, such as bags of golf clubs, minnow pails, and step ladders" but that "people generally do not lift 200-pound weights as a part of nonemployment life").

¶60 Even if we established a quantum of extensiveness or frequency for an activity to qualify as "typical" or "unusual," that would still leave the task of identifying a mechanism for applying these standards to the activities proposed for the baseline in an individual case. That could lead to an extensive trial within a trial—to allow the parties to put on expert or fact testimony as to the extensiveness and frequency of a given set of purportedly comparable activities, and to engage in a debate over whether and to what extent the baseline activities are comparable to the requirements of a claimant's job. And these practical problems may be enough to bring us back to the drawing board on the standard for legal causation.

¶61 The drawing board could lead us to revisit the *Allen* court's adoption of an objective standard. It would be helpful to have briefing on a possible basis for overruling *Allen* and replacing it with a subjective test.[5]

---

[4] *See, e.g.*, *Leitz v. Roberts Dairy*, 465 N.W.2d 601, 605–07 (Neb. 1991) (concluding without further development of the standard that the claimant's exertion while moving ice cream carts was "greater than that experienced during . . . ordinary nonemployment life"); *see also id.* at 608 (Shanahan, J., concurring) (expressing the view that "[t]he majority has declined to explain or illustrate application of the [objective] standard"—and describing the standard as "not only impractical but unrealistic and an invitation for conjecture and speculation").

[5] The parties, admittedly, have not "asked us to overturn *Allen*," or briefed the standard for overruling it under our doctrine of *stare decisis*. *Supra* ¶ 45. But they have asked us to apply the

(continued . . .)

¶62 Such briefing could highlight the imprecision in and unworkability of our objective test as it now stands. And it could develop a point made in the dissenting opinion in *Allen*—the notion that the operative text of the statute seems to cut against an objective standard. *See Allen*, 729 P.2d at 29 (Stewart, A.C.J., dissenting). The statute, after all, provides that an employee "injured . . . by accident arising out of and in the course of the employee's employment" is entitled to compensation unless the injury was "purposely self-inflicted." UTAH CODE § 34A-2-401(1). And it is hard to see how the "typical" or "usual" activity of the general public—or "average" people—should figure into this requirement of causation.

¶63 An individual worker's subjective nonemployment activity seems a better fit.[6] Under a subjective standard, an injury may not arise "out of and in the course of the employee's

---

*Allen* standard. And as the court of last resort in this state, it is our job to articulate that standard in clear, workable terms—terms that provide some promise that the cases in this field will be decided in accordance with the rule of law, and not on the basis of the case-by-case preferences of judicial officers. *See McDonald v. Fid. & Deposit Co. of Md.*, 2020 UT 11, ¶ 33, 462 P.3d 343 ("It is our province and duty to say what the law is. In fulfilling that duty we are not limited to a choice between the parties' competing positions. We must get the law right, even if in so doing we establish a standard that differs from either of the approaches presented in the briefing on appeal.").

Perhaps we would benefit from further briefing in order to accomplish that task. If so, we should ask for it. *See Widdison v. State*, 2021 UT 12, ¶ 120 n.32, 489 P.3d 158 (Lee, A.C.J., concurring) (recognizing this court's "prerogative of seeking supplemental briefing where we lack an express request and [would] find adversary briefing helpful" (citations omitted)). And if we decide not to seek it, we are "in no position to blame the decision not to reconsider [relevant precedent] on a lack of briefing" that is the result of "our own decision not to order supplemental briefing." *Blanke v. Utah Bd. of Pardons & Parole*, 2020 UT 39, ¶¶ 83–84, 86, 467 P.3d 850 (Lee, A.C.J., concurring).

[6] *See Leitz*, 465 N.W.2d at 610 (Shanahan, J., concurring) (criticizing the objective standard and advocating for "a more practical and realistic" comparison with "the employee's usual nonemployment exertion").

employment" if the worker suffers an injury at work while performing an activity he usually performs outside of work. *See* U<small>TAH</small> C<small>ODE</small> § 34A-2-401(1). The worker's subjective, day-to-day activities could thus be the relevant baseline under the statute. And such a baseline might elide the range of problems that are confounding our law in this area.

¶64 Some day this court will have occasion to consider these questions. When it does, I suspect it will reject the opaque, "objective" test set forth in *Allen* and replace it with a subjective standard that seems to better accord with the controlling text of the Workers' Compensation Act. I look forward to that day—from a new perch as an observer rather than a member of this court.

———————